AMERICAN WOOLEN COMPANY, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

Claims Nos. 2195-A, 15859 and 17115.

Court of Claims, June 16, 1925.

Canals — barge canal — claim against State for appropriation of property for improvement of Oswego canal — claimant's water rights at time of appropriation in question were such as were left to predecessor following appropriation for original Oswego canal, with exception of added power caused by raising dam in 1897 with consent of then owner — claimant's rights in Oswego river limited to extent of bulkhead openings in original dams — present claim is based on act of State in raising crest of two dams — result was to extend overflow of claimant's lands to extent of $1,000 in damages and to increase value of claimant's power by $100,000 — claimant is entitled to damage caused by overflow — cost to claimant by interference with flow of water during raising of dams and cost of readjusting machinery is consequential damage against which benefit may be offset — act of State did not amount to taking of property but increased value of claimant's property — State not responsible for cost of installation of new machinery to make available increased power — claimant has no claim based on fact that raising lower dam increased power thereat at its expense.

The rights of the claimant, who owns a woolen mill on the Oswego river which is operated by water power, to water flowing through bulkhead openings in one of the State dams opposite its premises were, at the time the State raised the dam out of which this claim arises, the same as those which were left to the claimant's predecessors in title following the appropriation by the State of water rights in the Oswego river in 1826, which was then made for the purpose of constructing the original Oswego canal, with the exception of added power caused by raising the upper dam in 1897 with the consent of the then owner.

Since there is no present written record of the appropriation made for the original Oswego canal from which may be determined the extent of the water rights remaining in the owner of the fee of the upland at that time, recourse must be had to the bulkhead openings left by the State in its dams to determine what rights were possessed by the owner of the upland at the time of the original appropriation after the State made this appropriation, and the extent of those openings determines the extent of the claimant's rights in the flowage of the Oswego river.

The action of the State in raising the crest of the two dams resulted in a slight increase in the amount of upland belonging to the claimant which was overflowed and the damage suffered by the overflow amounts to approximately $1,000, for which claimant is entitled to recover.

But another result of raising the crest of the two dams was to increase the head of water through which claimant received its power to such an extent as to increase the value of claimant's water power rights by $100,000 and that amount may be set off against consequential damages arising out of the fact that the claimant was required to furnish temporary power during the period of construction and would have been required to expend money to readjust its power

machinery, if it had not seen fit to replace that machinery which was old and out of date.

The State is not responsible for the cost of installing modern water power machinery, which the claimant installed for the purpose of availing itself of the increased power developed by the increase in the height of the dams.

Furthermore, there was no taking of the claimant's property, since it appears very definitely that the action of the State resulted in a distinct benefit to the claimant in the sum of approximately $100,000.

The claimant cannot recover damages against the State on the theory that the raising of the lower dam, from which the claimant did not receive its power, increased the power developed thereat at the expense of the claimant.

CLAIMS against the State for the appropriation and use of property, lands, water and riparian rights in connection with the improvement of the Oswego canal and the Barge canal.

*Davies, Auerbach & Cornell* [*Charles H. Tuttle* and *Martin A. Schenck* of counsel], for the claimant.

*Edward J. Mone, Deputy Attorney-General,* for the State of New York.

ACKERSON, P. J.:

The claimant herein, the American Woolen Company, is a New Jersey corporation. Since 1899 it has owned a tract of fifteen and two-tenths acres of land on the west bank of the Oswego river in the village of Oswego Falls, county of Oswego and State of New York. The city of Fulton is on the east bank of the river at this point.

Claimant's property has a frontage of about 2,250 feet on the river. The claimant has maintained thereon at all the times in question here a large woolen mill employing about 1,600 hands. Since July 8, 1903, the American Woolen Company of New York has been in possession of the property and operating the mill thereon under a lease from this claimant. The several claims which the claimant has filed against the State and which are being litigated together as one claim are for damages suffered by this claimant and also by its lessee, the American Woolen Company of New York. The latter assigned on the 20th day of March, 1914, its claim against the State to this claimant.

The claims herein demand damages against the State " for the appropriation of property and riparian rights belonging to the claimant and its assignor," also " for damages against the State, heretofore sustained for and on account of the appropriation and use by the State of property, lands, water and riparian rights belonging to the claimant and to the American Woolen Company of New York, its assignor."

These damages were caused, the claims assert, " in connection

with the enlargement and improvement of the Oswego canal and the construction of dams in the Oswego river as part of the plan for the canalization of said river authorized by chapter 147 of the Laws of 1903."

Claimant derived its title to the premises in question through a military patent to Abraham Barnes, dated July 9, 1790. This patent carried title not only to the uplands and bank of the river but also to the bed thereof to the center of the stream. Claimant's predecessors in title, before the intervention of the State in about 1826, possessed all the rights of a riparian owner on such a stream. They were entitled to the use of one-half of the natural flow of the Oswego river, for the purpose of developing the water power under the head naturally derivable upon their property. From an early date water power had been used on this property, but to what extent claimant's predecessors in title had developed the same at this point before the building of the Oswego canal in 1826 is not revealed by the evidence.

The original rights of claimant's early predecessors in title as riparian owners of the land in question, however, were modified when the State made its appropriations in order to build the necessary structures in connection with the construction of the Oswego canal in 1826. This is one of the most important points in this case. And it cannot be said with too much emphasis that whatever rights these early predecessors in title of claimant possessed in the river and to the use of the water of the river originally were changed by reason of the appropriations made by the State for the purpose of building the Oswego canal in 1826. And as the extent of the water rights left in claimant's predecessors after those appropriations is a matter of considerable importance to this case, we may well examine that question with some care.

The Oswego canal was authorized by chapter 279 of the Laws of 1824. Following the passage of that act and in the years of 1826 to 1828 the construction of the canal was commenced and completed. There being a distinct fall and rapids in the river opposite the premises in question and the river at that point being thereby made extremely difficult to navigate, it became necessary to pass these rapids by an artificial waterway or canal through the upland on the east shore. In connection with this construction the State placed two dams across the river at this point. One dam, known as the upper Fulton dam, was built about 250 feet north of the south line of claimant's property. The other dam, known as the lower Fulton dam, was built about 2,500 feet northerly from the upper dam. Both of these dams• necessarily backed water upon some of the land of claimant's predecessors and the

extent of the water power rights appurtenant to this property were thereby definitely fixed and limited. Definitely fixed because thereafter claimant's predecessors in title had no control of the dams from which their water power was derived. They could neither elevate nor lower the crest of either dam. They could not enlarge the bulkhead openings in the upper dam from which their water supply was derived. The flow and the head, therefore, which made up their water power had been fixed by the State and they were powerless to alter either. We do not know whether there were any bulkhead openings in the west end of the original upper Fulton dam or not. But, owing to the fact that it appears that water power was used here from an early date, we assume that such bulkhead openings were left there by the State for the use of the then owners of the property. And we further assume that the area of those bulkhead openings for the passage of water was as large as we find them to be in 1908.

The rights which claimant possessed in 1909 to use the waters of the river were only such rights with one exception as were left to its predecessors in title by the State after making its appropriations of land and water for the Oswego canal in about 1826. The exception referred to is the fact that in about 1897 the State with the consent and acquiescence of Charles Fletcher, the then owner of the property, raised the crest of the upper Fulton dam two feet.

We do not at this time undertake to define the extent of claimant's right if any to this two feet of additional head. The claimant and its immediate predecessor have been permitted to avail themselves of this additional head furnished them by the State without objection and without compensation. Having made use of it for many years without objection we assume that the claimant and its successors in title will be permitted to use it indefinitely.

We reach this conclusion as to the extent of claimant's water rights by applying the law as enunciated in the case of *Fulton Light, Heat & Power Co.* v. *State of New York* to the facts of this case. That case was decided in this court and unanimously affirmed by the Appellate Division and Court of Appeals. (13 Court of Claims, 285; 65 Misc. 263; affd., 138 App. Div. 931; 200 N. Y. 400.) That case is particularly applicable to the situation here. It arose at the east end of the lower Fulton dam. One question at issue there was the extent of the claimant's water power rights.

Judge Rodenbeck in his very able opinion speaking for this court said: " The difficulty of determining the rights of the parties since the appropriations by the State for the old Oswego canal lies in the fact that no grant of land or water rights affecting these

premises was made under the act of 1816 (chap. 237), and no appraisement was made pursuant to the act of 1817 (chap. 262); and, as there are no living witnesses to recount the actual transactions as they occurred at that time, reliance must be had upon the acts of the parties themselves, interpreted in the light of such documentary evidence as is available.    *    *    *

" When it [the State] began the construction of its canal in 1825, claimants' predecessors were in possession of the uplands and owned the fee of the bed of the river.   The State removed the wing dam, extending nearly to the center of the river, and in its place substituted a dam built across the river, furnishing a head of about twelve feet.   It connected by a pier the east end of the dam with the east high bank of the river, allowed claimants' predecessors to rest their sawmill upon this pier, and placed openings in the pier for the supply of water to the mill and also to the old wooden flume which previously existed.    *    *    *

" Although the appropriation made by the State was not followed by an appraisement, as required by the statute of 1817 (chap. 262), the State acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal, reserving for the claimants' predecessors such portion of the remainder of the water as was available through the openings which it left in the pier.    *    *    *

" Obviously it was not deemed necessary by the State to take from the claimants' predecessors all of the water of the Oswego river.   *This would have been accomplished had the State constructed the dam and pier from bank to bank, without openings for the mill and flume; and, had this course been taken by the State, the claimants would not be in a position to insist that the State in building the Barge canal should provide openings for the surplus water of the river.*    *    *    *

" Claimants' predecessors were compensated for the water rights which they lost when the wing dam was destroyed by the State by the appropriations made for the old canal which allowed them to draw water from the river under the increased head provided by the new dam.   Without this provision they would not have been in a position as of right to claim the benefit of any increased head created by the erection of a dam higher than the original wing dam.   Any power thus created belonged to the State, and they were not at liberty to draw upon this power without making a return to the State."   (13 Court of Claims, 285; 65 Misc. 263, 281.)

We have the same situation here, so far as the water power rights of this claimant are concerned, as confronted the court in the *Fulton Light, Heat & Power Co.* claim.   And what Judge RODENBECK said there can with equal propriety be said here.

Here as there the State made its appropriations, constructed its dam across the river and the only record or indication we have as to what water rights remained in the predecessors of the American Woolen Company are the size of the bulkhead openings which we assume the State left in the west end of the dam. We, therefore, conclude here as Judge RODENBECK did there that the State prior to the building of the old Oswego canal appropriated all the water rights of the predecessors of the American Woolen Company except the use of so much of one-half of the surplus flow of the Oswego river as would pass through the bulkhead openings which the State left in the west end of the dam at the head created by that dam.

We have called attention at some length to this feature of the decision in the *Fulton Light, Heat & Power Co.* case because the learned counsel of the American Woolen Company seems to doubt that this holding of the Court of Claims as is so clearly expressed in the opinion of Judge RODENBECK was actually approved by the Court of Appeals. He points to the following language in the opinion of Judge GRAY of that court to sustain his contention: " I think that, on the facts, the record title of the claimants to the land in question, by long continued possession and occupation, and their right, by prescription, to use the waters not actually needed for the old Oswego canal, are reinforced and made good." (200 N. Y. 420.) Judge GRAY not only did not criticize any portion of Judge RODENBECK's opinion, but on the other hand he said in closing: " At some length — quite sufficient I think for the purpose — I have discussed the important questions presented upon this appeal. For an ampler discussion of the questions of fact and of law, a reference to the opinions of the Court of Claims, may, most profitably, be made. Judge RODENBECK, who spoke for that court, has treated them with great thoroughness and ability." (200 N. Y. 422.)

It seems evident, therefore, that Judge GRAY did not intend to disagree with Judge RODENBECK as to the legal extent of the claimants' water rights which was the fundamental question at issue in that case. If he did, however, it will be noticed by a reference to the close of his opinion that the other judges did not concur with him. And furthermore, the findings of fact and conclusions of law which constituted the actual decision of the Court of Claims and which were unanimously affirmed by the Appellate Division and the Court of Appeals contained the following as the thirteenth conclusion of law:

" 13. At the time of the filing and service of the notices of appropriations claimants had no right as against the State to make

additional openings in the State dam, dam pier or hydraulic race and thus use more water from the Oswego river than that to which they were entitled at the time of the present appropriations."

We consider, therefore, that the *Fulton Light, Heat & Power Co.* case settles beyond all controversy that in those cases where the State made appropriations of water rights on the Oswego river for the purpose of impounding water to be used in connection with that canal, and there is at present no written record of the appropriation from which may be determined the extent of the water rights remaining in the owner of the fee of the upland, that recourse must be had to the bulkhead openings left by the State in its dam to determine what water rights were possessed by the owner of the upland after the State made its appropriations.

And in the case before us, as in the *Fulton Light, Heat & Power Co.* case, the amount of water that can pass through the bulkhead openings which we have assumed were left by the State in its dam for the use of this claimant's predecessors at the head created by such dam marks the limit and extent of the water rights of the American Woolen Company except as possibly they may have been enlarged by raising the crest of the dam in 1897.

In the case of *Bulger* v. *State of New York* (18 Court of Claims, 6) this court approved the decision in the *Fulton Light, Heat & Power Co.* case, which held that the rights of the claimants in the waters of the Oswego river were limited to the amount which could pass through two bulkhead openings left by the State in its dam. This case also held that the extent of the water rights left in the riparian owner after the appropriations made by the State for the old Oswego canal was not a matter of written record and could only be deduced by the size of the bulkhead openings constructed in the dam by the State for the use of the riparian owner in drawing water from the pool above the dam for power.

Judge FENNELL of this court in his opinion in that case said: " The power owner took his rights in the new dam by agreement,— which agreement is evidenced by the existing status thereafter. The power owner's rights became fixed as of that time, and have not and cannot grow with the advance of the science of water power development, except as such development can be applied to the limited flow permitted by the openings through the State dam into his headrace, and the head maintained by the dam.   The power owner's rights, as against the State, can never be greater than they were under the status maintained for so many years. The power owners accepted certain openings, heads, regulations of elevations, State construction and State maintenance of dam, etc., in payment for their rights interfered with.   Thereafter, their

rights were contractual rather than riparian, and they cannot grow and expand with the science of hydraulic development except as above stated." (18 Court of Claims, 30.)

A similar situation also confronted the court in the case of *Northern N. Y. Power Corporation* v. *State of New York* (111 Misc. 13). There the predecessors in title of the claimant were the original riparian owners on the west bank of the Oswego river at Minetto before the building of the old Oswego canal. They were utilizing the water in the Oswego river by means of a wing dam extending from their upland into the river. The State in building the old Oswego canal in 1826 appropriated some of their property and water rights, and built a dam across the river at that point. During Barge canal construction this dam was destroyed by the State and a new dam in a slightly different location and with a crest elevation of about ten feet higher than the one destroyed was erected. A claim against the State for damages for interference with water power and value of property appropriated was filed and this court was called upon to determine the extent of the water rights of the present owners of the property. We held as follows: " We have endeavored to point out the manner in which we now reach the conclusion that claimant's predecessors were entitled to use only the water that could be drawn through the 540.5 square feet of opening in the original dam at the head of 7½ feet available at that dam. Such right, under the doctrine of the *Fulton Light, Heat & Power Company* case, is based upon the presumption that it was the consideration given by the State and accepted by claimant's predecessors as payment for their water power rights when the State tore out their wing dam in about 1826 and erected its own dam for the canal. And such is now the legal presumption because we have no record of any appraisement following the original appropriation; because we have no record of the compensation which the State agreed to pay claimant's predecessors for taking away their wing dam and destroying their water power other than the dam itself; because we have no witnesses who can testify to the actual transactions as they occurred at that time. We must, therefore, as was said in the *Fulton Light, Heat & Power Company* case, ' have recourse to what was actually done.' The original dam structure, therefore, becomes the record of this transaction. This record discloses the right, and all of the right which claimant or any of its predecessors have had since the State constructed its first dam, or now have to the use of the surplus waters of the Oswego river at this point. And it does not appear that claimant's predecessors down to the time of Barge canal

construction ever contended that they had any greater rights. Claimant has never been entitled to use all the surplus waters of the river not necessary for the canal or for the purposes of navigation simply because its grantors were limited to such portions of that surplus as will pass through 540.5 square feet of openings in the dam at a head of 7½ feet, and none of them, therefore, could convey any greater interest." (111 Misc. 48.)

In the light of this background of history which reveals to us how the original water rights of riparian owners on the Oswego river were affected by the appropriations made by the State for the old Oswego canal nearly 100 years ago, we may have a clearer understanding of what the claimant's rights are to the use of the waters of the Oswego river on the premises in question.

It is plain that this claimant and its immediate predecessors in title never were in possession of those riparian rights appurtenant by law to upland on a non-navigable stream in its natural state. Those rights at the time of the building of the old Oswego canal were exchanged for what Judge FENNELL speaks of in *Bulger* v. *State of New York (supra)* as " contractual rights." That is, the riparian owner agreed to accept a definite amount of water limited by the size of the bulkhead openings in the State dam which he could utilize for power at the increased head available at such dam. And thereafter that amount of flow and head were the limit of his rights to use the waters of the Oswego river.

That was the situation of Charles Fletcher, the immediate grantor of this claimant, when in 1897 the State proposed to raise the crest of the upper Fulton dam about two feet. For he realized, apparently, that this change in the elevation of the crest of the dam meant an augmentation of his water power beyond any right which he possessed to have it increased by law. Consequently he gave the State a release which declares that in consideration of the State raising this dam about two feet he not only would never file any claim for damages by reason thereof, but that he would construct the steel bulkheads at his own expense for the State and under its supervision at the west end of the dam and forever maintain them.

And ever since 1897 the owners of this property have freely enjoyed that increase in head of two feet above and beyond any right or power which they had in and of themselves to secure it.

After 1897 the crest elevation of this dam was 347.8 feet Barge canal datum and the crest elevation of the lower dam was 331.85 feet Barge canal datum.

Thus in 1897 claimant's rights in the Oswego river were fixed by the foregoing dams, assuming for the purposes of this case,

without deciding it, that it had a vested right in the two feet of additional head it then received by reason of raising the crest of the upper dam. It will be noticed that when the State raised the crest of this dam in 1897 Fletcher not only constructed the new bulkheads at the west end of the dam but agreed with the State to forever maintain them. It is possible that this action on Fletcher's part might be held to be a consideration moving to the State sufficient to warrant the court in holding that Fletcher thereby became possessed of a vested right in the two feet of additional head made available by raising the crest of that dam. However, we do not, at this time, pass on that proposition. Fletcher and this claimant at least have had the benefit of this additional head whether they have a vested right in it or not. Claimant was not entitled, in the language of the *Waterford* case (*Waterford El. L., H. & P. Co.* v. *State of New York*, 208 App. Div. 273, 283), " to the natural flow of the stream along his land and its descent and all the force to be derived therefrom," because the pool of the lower dam prevented it. There was a fall of only about three feet from its tailrace which carried away the discharge from its water wheels to the crest of the lower dam.

In this situation in 1909 the claimant had built up a great woolen mill which was being operated by its assignor. The power for operating this mill was derived from water wheels in three different wheel pits. Mills Nos. 2 and 3 were operated by three wheels in wheel pit No. 1. Wheel pit No. 2 had seven wheels geared to a shaft 175 feet long extending into the mills from which power was transferred to the machinery. Wheel pit No. 3 was in Mill No. 1, and contained one wheel. Nine of these wheels were sixty-six-inch Hunt wheels, one a sixty-inch Hunt wheel and one a forty-five-inch Hercules wheel.

This was the old type of water power machinery and according to the State's witnesses practically obsolete. The wheels were inefficient, could not make an economical use of the water, and were not capable of developing the power available at this point on claimant's property.

Such was the situation of claimant and the extent of its rights when on June 19, 1906, the Superintendent of Public Works of the State of New York, pursuant to the provisions of chapter 147 of the Laws of 1903, entered into a contract known as Barge canal contract No. 10. It provided for the raising of the crest of the upper dam five feet and the lower dam three and fifteen one-hundredths feet, for the construction of new bulkheads at the west end of the upper dam in a slightly different location from the bulkheads then existing, for the construction of this canal and lock

on the east shore of the river and six taintor gates each twenty-six feet in width in the upper dam.

This contract also provided as follows: " The rights of owners of water power shall be maintained with as little interference with or interruption thereto as possible." It was very evident from this language that the State did not intend to " take " or " appropriate " any of claimant's property. And neither before nor during the performance of the work mentioned in that contract was any map or notice served on claimants apprising them that the State had appropriated any of their property.

It was more than three years after the date of this contract before the State contractor interfered in any way with claimant's water power. On July 21, 1909, however, in order to build new bulkheads at the west end of the upper dam, this contractor shut off claimant's supply of water by a cofferdam. This condition of affairs continued until September 29, 1909, about two months, when the new bulkhead gates were completed and thrown open for use. During these two months was the only time in all this construction that the claimant was deprived of its water by the State. Claimant, having ample notice that its water supply would necessarily be shut off during the construction of the new bulkheads, had installed a steam plant to supply the necessary power to operate its mills so that it was not compelled to shut down while the bulkheads were being built. Then the State work proceeded as follows: August 16, 1909, the State began work of raising lower dam from crest elevation 331.85 to 335 feet. On November 28, 1909, a portion of the crest of the lower dam 300 feet long had been raised to the new elevation. Work was then stopped on the lower dam until August 16, 1913, when the work of raising the crest of the dam to the new elevation was resumed and completed on November 5, 1913. On July 25, 1912, the work of raising the crest of the upper dam from elevation 347.8 Barge canal datum to elevation 352.8 feet Barge canal datum was begun. This work was completed November 5, 1912.

It will be observed, therefore, that the first interference with claimant's water power began on July 21, 1909, when its water was shut off by a cofferdam which condition existed for only about two months. Also that the last work of the State affecting the claimant's water power was on November 5, 1913, when the work of raising the crest of the lower dam was completed. It will also be observed that the only actual physical interference with claimant's property, except as the increased elevation of the dams set the water back therefrom to some small extent more than theretofore upon claimant's lands and structures, that took place during the

course of this construction was when the State contractor was building the new bulkheads.

While the head at which claimant could utilize the water was raised five feet at the upper dam, yet the raising of the lower dam three and fifteen one-hundredths feet backed the water up in its tailrace and thereby cut down the increase in head to one and eighty-five one-hundredths feet. The State's experts testify that the net gain in head by the claimant is something over two feet, which they arrive at by taking the difference between the elevation of the two pools. However, it is sufficient to say that the net available head of claimant's water power has been increased from about fourteen feet to sixteen feet or over which we conclude from the evidence has increased the value of claimant's property by at least $100,000.

The claimant, knowing years before the reconstruction of the dams took place just what effect that reconstruction would have on its property, took steps to utilize the increased amount of power that would thereafter be available. It could at an expense of about $15,000 have raised its water wheels and adjusted them to the new level. But inasmuch as the rated capacity of its eleven water wheels when new was less horse power than could now be derived by an efficient use of the water it was entitled to use at the new head, it became an economical necessity to discard its old, antiquated and obsolete water power machinery and build a new modern hydro-electric plant.

On or about September 9, 1912, therefore, it discarded all water power, took out its old water wheels and sold the eleven of them for $940 and commenced the construction of its new plant. For the purposes of this litigation, claimant concedes that the new hydro-electric plant was completed September 9, 1913. This plant had three units of 1,000 horsepower each which actually develop 1,200 horsepower each. Provision was made in the plant for installing two more similar units when needed. All that claimant needs to operate the machinery of its mill is 1,441 horsepower. It has, therefore, a surplus of about 2,160 horsepower now which will be increased to 4,560 horsepower when the other two units contemplated are installed.

The net result of the State's reconstruction of the two dams in question, therefore, was to greatly increase the potentiality of claimant's water power by increasing the head at which the water could be utilized without in any way permanently impairing claimant's property or the rights which it possessed to the use of the waters of the Oswego river. As we have already pointed out, it was impossible for this claimant ever to obtain any increase

in the available head of its water power unless the State should find it necessary to increase that head for the purposes of the Oswego canal. This is just what happened by reason of the construction under consideration, and again as in 1897 the owner of this property becomes the beneficiary of the State.

But the present owner, unlike Fletcher, considers that its property, including water rights, has been taken, injured and destroyed by the aforesaid operations of the State and demands that the State should be made to respond to it in damages.

On March 27, 1914, claimant filed a notice of intention to file a claim against the State as required by section 264 of the Code of Civil Procedure then in force. This notice announced the intention of claimant to file a claim against the State for $750,000 " for lands, structures and water appropriated and the damage done to claimant's mill properties, rights, privileges and water power known as the Fulton Mills * * * by the State of New York * * * in the improvement of its canals, etc." On April 2, 1914, claimant filed an amended notice of intention in the same form as the prior one except that it recited the assignment to it of the claim of the American Woolen Company of New York. On January 23, 1915, claimant filed its first claim against the State. It alleged among other things the following:

" This claim is for the appropriation of property and riparian rights belonging to the claimant and to American Woolen Company of New York, its assignor, by the construction of dams in the Oswego river as part of the plan for the canalization of said river authorized by Chapter 147 of the Laws of 1903. The claimant's assignor is a corporation duly organized and existing under and pursuant to the laws of the State of New York. * * *

" It is the intention of the State to maintain these dams permanently at their present heights, and to raise the level of the water in the Oswego river to the level of the top of these dams, and to acquire and appropriate from the claimant and its assignor the right and privilege so to raise and maintain said dams and the level of the water in the Oswego river at that point.

" As a result of the acts of the State hereinbefore described, and in order to avoid the flooding of power units Nos. 1, 2 and 3, it became necessary for the claimant and its assignor either to install an entirely new water power plant or else (1) to remove the wheels and reconstruct the wheel-floors and gear-floors at higher elevations, (2) to strengthen or reconstruct the side walls and supporting structures at power units Nos. 1, 2 and 3, including the building of new bulkheads at power units Nos. 2 and 3, (3) to raise and strengthen the side walls of the forebay in order to resist the.

increased pressure resulting from the raising of the upper dam. The course actually adopted by the claimant and its assignor was to tear down storehouse No. 2 and to concentrate its entire water power plant in a new building erected about fifteen (15) to twenty (20) feet above the location of the storehouse No. 2, such power plant being of greater capacity than the former plant and involving an expense to claimant or its assignor for cost of construction alone, without regard to incidental damages, exceeding two hundred forty-seven thousand three hundred and sixty-five dollars ($247,365). If the new plant had been of the same capacity as the old plant, the total cost of constructing same, without regard to incidental damages, would have exceeded two hundred forty-six thousand four hundred and twenty-five dollars ($246,425). But for the changes made by the claimant and its assignor to counteract the taking by the State of their riparian rights and to minimize the damage resulting therefrom, the claimant and its assignor would have been permanently excluded from the beneficial use of their said property, their mills would have been deprived of value for the business for which they were designed and equipped, or for any manufacturing purpose whatever, thereby causing a loss greatly in excess of the expense of the changes and protective measures which were employed by the claimant and its assignor. By reason of the expense of such protective measures and changes and the loss of power incidental thereto, or otherwise resulting from the acts of the State herein described, the claimant and its assignor have suffered damage in the sum of three hundred fifty-eight thousand six hundred dollars ($358,600).    *    *    *

" The particulars of the incidental damage sustained by the claimant's assignor through the loss of water power resulting from the acts of the State hereinbefore described, are as follows:

"(1) Loss of power resulting from actual interference by the State with the flow of the river during the progress of the work herein described, including the expense of providing temporary power by means of steam and/or electricity, $60,900.

"(2) Loss of power during the readjustment and reconstruction of power units to adapt the power plant to the changed conditions resulting from the acts of the State herein described, including the expense of providing temporary power by means of steam and/or electricity, $51,275.

" While it would have been practicable from an engineering standpoint to have remodeled and reconstructed separately the original power units Nos. 1, 2 and 3, so as to adapt the same to the changed conditions arising through the acts of the State herein described, such a course would have involved so great interference

with the business of the claimant's assignor, with such large resulting damages, as to have been more expensive in the end than the course which the claimant and its assignor pursued of constructing an entirely new power plant in a new location, concentrating all power units under one roof."

On May 5, 1918, claimant, seeking to take advantage of the provision of chapter 606 of the Laws of 1918, filed another claim in all respects identical with the one filed January 23, 1915, and numbered 15859.

These two claims were consolidated by an order of this court dated May 7, 1918, and they were tried together.

At the close of claimant's case the State moved to dismiss these claims on the ground, among others, that the court was without jurisdiction to hear or determine the same, for the reason that they were not appropriation claims within the meaning of the term " appropriation " as used in the Barge Canal Act (Laws of 1903, chap. 147, as amd.), section 264 of the Code of Civil Procedure or chapter 606 of the Laws of 1918, and that claimant had failed to file a notice of intention to file the same within the time required by section 264 of the Code of Civil Procedure.

This court granted the motion so made by the Attorney-General and in doing so expressed its conclusions as follows:

" We conclude, therefore, that this is not an appropriation claim within the meaning of the Barge Canal Law nor of section 264 of the Code of Civil Procedure; that this claimant can recover only such damages against the State, therefore, as accrued within a period commencing six months prior to filing its first notice of intention on March 27, 1914; that all of the damages mentioned in its claim and for which it contended on the trial accrued before that time. *Buckles* v. *State of New York*, 221 N. Y. 418; *Butterfield* v. *State of New York*, Id. 701.

" This case is similar in some respects to *People's Gas & Electric Company of Oswego* v. *State of New York*, lately decided in this court and affirmed with some modifications by the Appellate Division. *People's Gas & Electric Co.* v. *State of New York*, 18 Ct. Cl. 162; affd., 189 App. Div. 421. In that case claimant's water power was interfered with and absolutely shut off during Barge canal construction. Claimant did not contend that it was an ' appropriation,' although it might have done so with just as much propriety as that contention is made in this case. It was an interference with claimant's water power only during Barge canal construction, nothing more, the same as in this case.

" Construction work by the State on its own property which necessarily results, as far as the State is concerned, in an involuntary

temporary suspension of a claimant's ability to exercise its rights in and to its water power in the absence of any attempt on the part of the State to challenge the validity of those rights or to transfer the ownership of such rights from the claimant to the State, does not make the State amenable to the charge of having ' appropriated ' claimant's property.

" The case of *Frisbie & Stansfield Knitting Co., Inc.,* v. *State of New York* is so similar to this case, so far as the legal principles applying to its disposition are concerned, as to be almost controlling, if not absolutely decisive, of our determination here. There this court held that the erection of a wall in the bed of the Oswego river by the State upon its own land was not an ' appropriation or use ' of the claimant's property, although the effect was to narrow the channel of the river, and at certain seasons of the year to so check the flow of the river as to set back the water in claimant's tail race and upon its water wheels. This holding was affirmed by the Appellate Division. *Frisbie & Stansfield Knitting Co., Inc.,* v. *State of New York,* 189 App. Div. 341. * * *

" The claimant, therefore, not having filed a notice of intention to bring this claim against the State within six months from the time of the accrual of any of the damages complained of, the court is without jurisdiction to pass upon the same and the motion made herein by the State to dismiss the claim should be granted for that reason." (*American Woolen Co.* v. *State,* 110 Misc. 413.)

The claimant appealed from that decision of this court to the Appellate Division, Fourth Department. That court reversed the judgment of this court dismissing the claims and remitted the claims to this court for a new trial thereon. In doing so it declared that the making and filing of a map was not a condition precedent to the making of a claim for an appropriation of property. That if the State enters upon, takes possession of, and uses lands for the purposes of a public work and improvement it is an actual " taking " or " appropriation " of land by the State for a public use for which compensation must be made under the provision of article 1, section 6, of the State Constitution. It further held that the claim in form was one for an appropriation of property in which case the claimant was not called upon by law to file any notice of intention. And in this connection the learned justice who wrote the opinion of the court said:

" The learned counsel for the State contends that the claim filed and the proof presented do not establish that the property in question was actually appropriated. There is some merit in his position. The claim itself is unnecessarily prolix, vague and ambiguous, and might perhaps as readily be interpreted as a claim

for a temporary taking or trespass as for a permanent appropriation; and the claimant made proof to establish a measure of damage for trespass rather than for an appropriation of the land and its appurtenances. But as the claim was dismissed because barred by the statute, the claimant is entitled to the most favorable view we may give to the claim and the evidence supporting it, and we believe it is sufficient fairly to apprise the State that the nature of the claim sought to be established is one for a permanent appropriation. At any rate, if the claim ' has its roots in equity and justice,' its recognition should not be denied because of technical objections to inapt language in making the claim, or because counsel on the trial made proof of the wrong measure of damages. * * *

" The stipulation as to the facts contained in the record was only for the purpose of the motion to dismiss and for the appeal, so it is a question of fact not yet decided whether or not the change in the level of the pool by raising the crest of both dams did actually take lands from the claimant and did deprive it permanently of existing water rights. These questions of fact should be determined by the Court of Claims. If there had been a permanent appropriation of property compensation should be made, applying the usual measure of damages, to wit, the market value of the property actually taken, with the consequential damage resulting to the remainder, giving consideration in the latter item to the value, if any, of the increased head of water now available to the claimant. (*South Buffalo R. Co.* v. *Kirkover,* 176 N. Y. 301; *Matter of City of New York,* 190 id. 350, 360; *Lehigh Valley R. R. Co.* v. *Canal Board,* 204 id. 471, 477; *Brainerd* v. *State of New York,* 74 Misc. Rep. 100, 106; 20 C. J. 756, 766.) If it should be established that the interference with the rights of the claimant are only temporary, casual or intermittent and there is no permanent use or appropriation of property by the State, and no established existing right has been destroyed, then there has been a mere trespass, and as we held in *Frisbie & Stansfield Knitting Co.* v. *State of New York* (189 App. Div. 341), the claim is barred by the statute.

" We have not thought it best to discuss the many other questions raised on this appeal. A trial of the issues of fact may either eliminate them entirely or present them in a different light, and any present attempt on our part to settle them would probably result only in embarrassment to the trial court. On the present state of facts, however, we hold, as we have indicated, that the Statute of Limitations has not run against a claim for appropriation of lands. We believe the claim for interference with the water supply caused by the installation of the cofferdam from July 21,

1909, to October 18, 1909, is a mere trespass, and not an appropriation of property, and that claimant has lost its right to compensation by its failure seasonably to file the notice of intention to make claim." (*American Woolen Co.* v. *State of New York,* 195 App. Div. 698.)

And so the case came back to this court for a new trial and the new trial was had. In the meantime, however, the claimant files still another claim which is numbered 17115. This claim was consolidated with the other claims and all tried together at the retrial. This last claim is, in some respects, a most remarkable document. Notwithstanding the fact that claimant is now and during all the time in question has been in the full possession and occupation of practically all its upland, plant and machinery with its title unquestioned and unchallenged; notwithstanding the fact that the raising of the two dams by the State left its water rights not only unimpaired, but on the other hand greatly improved and increased in value to such an extent as to increase the market value of its fifteen and two-tenths acres of land at least $100,000, it asks for damages to the extent of $1,112,175, for loss of water power during the progress of the work by the State, cost of providing temporary power by means of steam and electricity, and the market value of claimant's lands, property and water rights permanently appropriated and taken by the State. It could not well ask for more if the State had driven it completely out of the river and compelled it to operate its great plant by steam or electricity purchased from some distributing company. But claimant's actions belie its words. In spite of the great calamity which it would have us believe has fallen upon it, it is so confident that its water rights not only remain with it, but have been greatly magnified by the Barge canal operations that it expends $259,421.75 in building a modern hydro-electric plant to utilize its improved water power.

On the retrial the State submitted its defense to this claim and its proof to sustain the same. The claimant again submitted proofs to sustain the different items of damage alleged in its claim to have been suffered by it by reason of the operations of the State in raising the two dams. Now we have the whole story before us and what do we find?

*First.* For three months the State cut off claimant's water by a cofferdam while building the new bulkheads for claimant's use at the west end of the upper dam. This, as the Appellate Division says, was a " mere trespass * * * and that claimant has lost its right to compensation by its failure seasonably to file the notice of intention to make claim."

*Second.* The State in building the new bulkheads at the west end of the upper dam for claimant's use built them on a slightly different location from the old bulkheads. It has taken, therefore, for a public use so much of claimant's land in the bed of the Oswego river as that bulkhead rests upon. The exact extent of the land so taken and its value are not revealed by the evidence. It is land in which the State already had a permanent easement to flood and now it has taken the fee. Its value at most can be only nominal.

*Third.* By raising the crest of the upper dam five feet a small additional amount of claimant's upland above that dam may have been permanently flooded. If that is so, then in such portion of claimant's upland a permanent easement to flood was taken and appropriated by the State. But the evidence is silent on this subject and, therefore, the fact in relation to it is unknown to the court.

*Fourth.* By raising the crest of the lower Fulton dam three and fifteen one-hundredths feet a narrow strip of claimant's land on the practically perpendicular bank of the river, some three or four feet wide, was thereby flooded where said bank came in contact with the pool made by that dam. Here also we are not informed by the evidence as to the quantity or value of the land in which the State has so taken and appropriated a permanent easement to flood. At most it could have but a nominal value.

We have indicated all that has been directly " taken " or " appropriated " by the State from this claimant. Whatever other damages this claimant has suffered in the premises are consequential to and resulting from the appropriations of the land and easements above mentioned.

The claimant in all its claims in alleging what part of its property the State has appropriated states as follows: " It is the intention of the State to maintain these dams permanently at their present heights, and to raise the level of the water in the Oswego river to the level of the top of these dams, and to acquire and appropriate from the claimant and its assignor the right and privilege so to raise and maintain said dams and the level of the water in the Oswego river at that point."

The learned Deputy Attorney-General in his brief quotes the above statement from the claims herein and says if the State has appropriated anything belonging to claimant and its assignor the above is a true statement of what was appropriated. We cannot agree with this view of the learned counsel for the claimant and the State. These dams belonged to the State. It had the legal right to raise them. That right was inherent in the State and it had empowered its officers so to do by specific act of its Legislature. (Laws of 1903, chap. 147.) The State could change

them or reconstruct them in any manner it saw fit because in so doing it was dealing with its own property.

It is apparent to us, therefore, that the State had the right to raise these dams. In addition, however, if the State, by reconstructing its dams, decreased either (1) the head, or (2) the flow of water to which the claimant was entitled, or (3) the amount of upland to claimant belonging by permanent flooding a portion thereof, then, and in that event only, could the State be held for taking or " appropriating " any of the claimant's property. This claimant had the right to use on its property so much of one-half of the surplus flow of the Oswego river as could be passed through the bulkhead openings at the west end of the old State dam for water power at the head made available by that dam. That is the law of this case as established by the decision in the case of *Fulton Light, Heat & Power Co.* v. *State of New York (supra).* That right has not only been preserved to this claimant but it has been added unto by an increase in the available head of about two feet. It cannot be said that the State has taken anything from this claimant when the acts complained of increase the value of its property. Claimant was developing water power by a certain quantity of water which it was permitted to use from the Oswego river at a head of fourteen feet. The acts of the State have raised that head to sixteen feet or over and thereby increased the value of its property about $100,000.

That is not a " taking " by the State from the claimant. That is a " giving " by the State to the claimant. The acts of the State have not diminished claimant's water power but increased it; they have not lessened the value of claimant's property as a whole but greatly increased its value.

All the authorities define the word " taking " when it is used to represent the act of the sovereign power in relation to private property as an act which " destroys or lessens its value, or by which the owner's *right* to its use and enjoyment is in any substantial degree abridged or destroyed." (Lewis Em. Dom. [3d ed.] § 65.)

None of the claimant's water power has been taken by the State for the simple reason that it has been increased instead of diminished by the acts complained of. Only the land above mentioned has been taken.

All that the appropriations of the easements heretofore mentioned did practically was to temporarily interfere with the operations of claimant's water wheels. There was no lessening of the value of claimant's upland except as it was diminished by the value of the land actually taken. Its water rights were enlarged and increased in value and its *right* to the use of the same remains

unchanged. By raising the elevation of the surface of the stream the small portion of claimant's upland above referred to was destroyed as upland. For the value of the easement to flood such land, therefore, if there is any proof of its value in the record of this case, the claimant should be compensated without any offset for benefits. All other damages which it has suffered are consequential in their nature against which benefits may be offset.

But directly incidental to and as a consequence of the appropriation or taking of the land above referred to claimant's property and machinery by means of which the water at its command was utilized for power would have been hampered to some extent by the increased elevation of the surface of the river if such property and machinery had remained in place. It would not have been destroyed, it would not have been overwhelmed, it would not have been swept out of the river, as the eloquent counsel for the claimant alleges in his arraignment of the State for inflicting damages which he and his witnesses believe his client would have suffered if claimant had not acted to prevent it. While the change in the level of the pool by raising the crest of the two dams, therefore, did actually take lands from the claimant in the way we have pointed out, yet it did not deprive the claimant of its existing water rights. It did not interfere with claimant in using, nor prevent it in any degree from making full utilization of its machinery. The right was still there. That did not change except as it was enlarged. Its water rights consisted of the use of such an amount of water as would pass through the bulkhead openings in the old dam to be used for power at the head to be furnished by that dam.

These rights, of course, did not vary with the rise and fall of the surface elevation of the stream. It did not matter, therefore, what change the State made in the surface elevation of the river so long as it preserved to the claimant the flow and head to which it was entitled. Inasmuch as the new bulkheads will pass more water than the old ones because of the increased elevation of the crest of the dam; and inasmuch as a great deal more power can now be developed from this water by the claimant than heretofore because of the increased head at which it can be used by reason of the new dam, it is plain that claimant's water rights have not in any way been " taken," " destroyed," " appropriated " or even " diminished." Claimant was entitled, it is true, to the use of the stream at the particular level to which its machinery was adjusted. The change of that level caused by the appropriation of an easement to permanently flood some of its upland necessitated a slight change in the adjustment of its water power machinery. This was a temporary interference with the use of its water power

rights incident to the appropriation aforesaid. It was a damage for which claimant must be compensated. But under all the rules of law, as we understand them, it was a consequential damage. (*Kerr* v. *Joslin*, 20 N. Y. Supp. 929; *Chase-Hibbard Milling Co.* v. *City of Elmira*, 207 N. Y. 460; *Atwater* v. *Trustees of Canandaigua*, 124 id. 602.)

The claimant might have readjusted its old, obsolete, inefficient machinery to the new level of the river and the cost of doing so and of supplying the necessary substitute power while the change was being made would represent the amount of its consequential damages caused by the appropriation of the easements in the land as aforesaid. The claimant contends that the cost of the readjustment would have been $173,400. The State's expert says it would have cost $8,000. We believe that $15,000 would have been ample for this purpose. It would have taken as we conclude from the evidence not to exceed four months to make this readjustment and the cost of furnishing the necessary substitute power for that time would not have exceeded $10,000. As claimant received benefits from the new construction worth $100,000 such benefits offset and are far in excess of such consequential damages. But the claimant had no consequential damages. It had only consequential benefits. It did not discard all of its old water wheels, wheel pits and strengthen the walls of its forebay because it was compelled to do so by the operations of the State. It would have done so in any event. Even though those structures had been perfectly secure and even though all its old water power machinery could have continued to operate unhampered by this increase in head, yet the claimant would have discarded it just the same. The claimant could not, with the new head furnished by the State, make an economical use of its water with the old machinery. Only a portion of the power now available could be so utilized. For its own purposes, for its own enrichment, for its own necessities, the claimant was compelled to take out its old antiquated water power machinery and substitute therefor a new hydro-electric plant. The State did its part in making a larger water power available on claimant's premises. Such work on the part of the State was, it is true, incidental to its canal operation but it is just as valuable to this claimant as though the work was performed for the specific purpose of augmenting claimant's water power. The State cannot be charged with destroying property of the claimant when the claimant was compelled to discard such property for its own business purposes.

Of course, the fact in this case is that none of claimant's property was destroyed. Without regard to what destruction of claimant's

property might have taken place if claimant had not taken steps to protect it, the fact is that no injury was done to it by the State. The claimant had ample notice of the action of the State in raising the two dams. It had engineers at its command, competent not only to devise ways and means to protect its property from any harm by reason of the higher levels to which the surface of the two pools adjacent to its property was to be raised, but competent to take full advantage of the situation and not only to avoid any threatened injury but to fully utilize a benefit laid down at its door by the State valued at $100,000.

And the claimant's engineers did just that. For doing so the claimant is entitled to no credit. It did nothing more than the law required it to do. It was under legal obligation to mitigate its damages as much as possible. It mitigated the damages it is talking about out of existence when it withdrew its water power machinery from the river and constructed an entirely new plant to utilize its water at the head now available. It did this not to save them from destruction but to avail itself of the great benefit which it could derive from the increased head. There is nothing in law or equity that will sustain the claimant in demanding damages that it has not suffered because it might have suffered them if it had done nothing to protect itself from threatened injury. The reasoning of the Court of Appeals in the case of *Bohm* v. *Met. E. R. Co.* (129 N. Y. 576) is clearly applicable here. That was a case where the sole question at issue was as to the proper rule to be observed in estimating damages to abutting owners for loss of or interference with easements of light, air and access on a street occupied by an elevated railroad. What the court said there seems to apply to the facts of this case with great force:

" Strictly speaking it is not a question of benefits at all, except that proof of benefits may be one way of showing there has been no injury. The value of the easements taken, we have seen, was merely nominal, and the sole question which remains is, therefore, has the owner suffered any damage or injury whatever which has been caused by this taking, for if there has been no damage there can be no recovery. To ascertain the fact, whether there has been damage, an excursion into the realms of possibilities as to what might have happened but did not, is not permitted. The inquiry whether the land would have been injured if certain circumstances had not occurred which not only prevented such injury, but enhanced its value, is wholly immaterial. The question is, what in fact has been the actual result upon the land remaining? Has its actual market value been decreased by the taking, or has the taking prevented an enchancement in value greater than has

actually occurred, and if so, to what extent? The amount of such decrease in the value of the remaining land, or the amount of the difference between its actual market value and what it would have been worth if the railroad had not taken the other property, is the amount of the damage which the defendants should pay. If on the contrary, there has been neither decrease in value caused by the railroad, nor any prevention of an increase from the same cause, how can it be truly said that the lot owner has been injured to the extent of a farthing? * * *

" Is the owner to be permitted to recover as damages the amount which it is guessed at or surmised he would have sustained by the depreciation in value of his land, if it had not been for the fact that it had in truth increased in value? What semblance of justice would there be in such a rule? The only possible injury which the defendants could cause him by their action lies in the injury they might do his remaining land. An investigation of that question reveals the fact that this land has actually increased in value since the taking spoken of, and the fact is not claimed or proved that it would have increased as much but for such taking, and yet, by a course of what may be called abstract reasoning, the defendants are to be compelled to pay such a plaintiff an amount of money as representing damages he never suffered. Any reasoning, abstract or otherwise, which permits such a result, is lame somewhere. * * *

" It is only necessary for us in this case to decide that if the property of the plaintiffs have increased in value since the taking of these easements or a portion of them, and if such increase is largely due to the building and operation of the defendants' road, and if such increase would not have been greater but for the action of defendants, then the plaintiffs have suffered no damage." (129 N. Y. at pp. 592, 595.)

The State, therefore, has taken nothing from the claimant except the easement to permanently flood a very small portion of its upland and the land on which the new bulkheads are built as we have heretofore pointed out. If by any stretch of the imagination any damage to this claimant can be figured out of the great benefit that has been bestowed upon it by raising these dams such damage could only be consequential to the appropriations aforesaid. And as we conclude claimant has been benefited to the extent of $100,000; and as it would have cost not to exceed $15,000 to adjust its old machinery to the new levels, and $10,000 for necessary substitute power while that was being done, it is plain that the damages if there can be said to be any are clearly

offset by the benefits. We have heretofore called attention to the fact that it is the view of the learned counsel for both the State and the claimant that what in fact the State appropriated from the claimant was, the right and privilege to raise said dams to their present heights and maintain them there permanently and to thereby raise the level of the water in the Oswego river at that point to the top 'of those dams.

We have stated our reasons for dissenting from this view and for our belief that the real appropriations are as we have stated. However, conceding for the purposes of the argument, that the views of the learned counsel are correct, then and in that event, the damages could not be other than as we have declared them to be. The cost of adjusting the old machinery to the new level and the cost of furnishing substitute power while that was being accomplished would certainly be consequential to the taking of the right to raise the dams and could be properly offset by benefits.

Claimant complains that the bulkhead openings are smaller than in the old dam and, therefore, some of its water has been taken from it. There is nothing to this claim because it clearly appears from the evidence that the present openings at the new head will pass as much water as the old openings at the lower head.

Claimant also complains because, by raising the crest of the lower dam, power is developed at that dam at claimant's expense. Claimant could not be damaged in this way as it claims because

*First.* It could never raise or lower that dam. It could not for any consideration dispose of the privilege of raising the water on its premises above that dam because the dam being owned by the State is not subject to private control.

*Second.* The privilege of raising the water in the lower pool could not have any value to claimant because whatever value it might otherwise have would be offset by the loss claimant would sustain in having the available head at the upper dam reduced by whatever amount the lower dam might be raised.

Claimant in our judgment fails to remember that at the beginning of Barge canal construction its status on the Oswego river was not that of an ordinary riparian owner. It apparently fails to remember that its riparian rights were fixed and limited after the building of the old Oswego canal to the amount of water it could draw through the bulkhead openings of the old dam to be used for power at the head available at that dam.

In this connection the learned counsel for the claimant says he has inquired of the Attorney-General if he concedes that the claimant's right to the new head is a vested right.

That question, of course, is not in this case and it is well enough

perhaps to pass on that question so far as it is controlled by the facts of this case when the State, if it ever does, disputes claimant's right to the use of the new head available at the Barge canal dam without making compensation. Or, at least, when the State claims the right to lower the crest of that dam without making compensation to the claimant or the then owner of the property in question. Claimant seems to be much exercised about the taintor gates in the new dam and the great danger that the available head to be derived from that dam will be destroyed because of the operation of such gates. It does not appear that since the installation of those gates in 1909 the claimant's water power has suffered any appreciable loss because of the operation of those gates. If claimant should be damaged by this operation in the future that will be a matter for the court to adjust when the injury is complained of.

The learned Appellate Division in returning this case to this court for a retrial said: " The stipulation as to the facts contained in the record was only for the purpose of the motion to dismiss and for the appeal, so it is a question of fact not yet decided whether or not the change in the level of the pool by raising the crest of both dams did actually take lands from the claimant and did deprive it permanently of existing water rights. These questions of fact should be determined by the Court of Claims." (195 App. Div. 704.)

In answer to the first of those questions, we reply that the lands and easements we have referred to heretofore were taken from the claimant. Their value was merely nominal, and we have fixed that value at $1,000.

In answer to the second of the foregoing questions, we reply that the claimant has not been at any time permanently deprived of any water rights.

We find that the claimant has been benefited by the work of the State in raising the two dams $100,000. If the claimant can be said to have been damaged at all by the work of the State in question, it is only for consequential damages caused by the appropriation of the land and easements aforesaid in a sum not exceeding $25,000 as we have heretofore pointed out.

That against this amount of damages the foregoing sum of $100,000 for benefits may be offset, so no award can be made to the claimant except for the sum of $1,000 for the property actually taken, with interest thereon from July 21, 1909, the date of the completion of the work of raising the crest of the lower dam.

SMITH and PARSONS, JJ., concur.