Richard S. Heller, J.
On March 15, 1962, the State of New York appropriated a portion of claimant’s land pursuant to section 30 of the Highway Law. The parcel taken is designated as Parcel No. 23 on Map No. 19 of Griffin Corners State Highway No. 36, Delaware County, and the court adopts as accurate the description contained on the official map filed in the office of the Delaware County Clerk.
Prior to the appropriation, claimant’s property consisted of slightly more than 4.5 acres on the corner of and fronting on both Wagner Avenue and Deposit Street in the Village of Fleischmanns. Situated on the property were a number of buildings used by the claimant in its business of manufacturing hardwood veneer, which had been in continuous operation since 1938. Also situated on the property and within the boundaries of the parcel appropriated by the State was a spring-fed pond with a storage capacity of 113,000 gallons.
Approximately 12 million gallons of water each year were required in claimant’s operation, and prior to .the appropriation, the pond satisfied all of claimant’s water needs from a quantitative -standpoint. The water from the pond was used in boilers producing steam for drying the veneer, for steaming logs, heating the logs, heating the plant, spraying logs and for power to drive the claimant’s machinery. It was also used for sanitation and fire protection, as a solvent and as a cleanser. In other words, without an adequate water supply, the operation of *1045 claimant’s plant would cease. In addition, uncontroverted testimony with respect to claimant’s experience and qualitative analyses established that from the standpoint of alkalinity and hardness, the water was uniquely suited for use in claimant’s operation. Although the parcel appropriated amounted to less than 10% of claimant’s land, the appropriation resulted directly in the destruction of and loss to the claimant of this free source of water.
Experts for both the claimant and the State testified that the property was being put to its highest and best use and agreed that an adequate supply of water was indispensable to claimant’s operation. In view of the conceded absence of comparable sales of similar plants, appraisals submitted by both parties were based primarily upon reconstruction cost less depreciation with respect to improvements. In determining the value by this approach, the proof compels a finding that prior to the appropriation the value of claimant’s property, even if viewed as a simple sum of its component parts, exceeded $380,000. In arriving at this figure, which does not purport to represent full value as a going concern, the court has assigned the following-values to the land and improvements:
Land (4.52 acres @ $5,000 per acre)............... $22,600
Machinery specially adapted and installed for use in
the business (cost less depreciation).............. 139,900
Buildings (cost less depreciation).................. 116,600
Water supply and storage —
Equivalent storage .................. $38,000
Water conditioning plant............. 43,000
Cost of drilling well and hook up to village water system............... 16,500 97,500
$376,600
In assigning these values the court has assumed, for the purpose of arriving at a minimum valuation, that the State’s witnesses were correct in their appraisals of the depreciated value of the machinery and buildings and that a well with a standby connection with the water system of the village would supply an adequate supply of water from a quantitative standpoint. Even for this limited purpose, however, the State’s contentions with respect to the proper classification of claimant’s machinery and the necessity for and cost of water storage and conditioning facilities have been rejected. The machinery and equipment, with minor exceptions (“ Three Diehl Model Splicers Dep. Value $5,100 ”) had been specially installed and attached *1046 to the claimant’s realty and were obviously integral parts of a fully operating concern and could hardly be regarded as “ personalty ” rather than “ fixtures ” as those terms have come to be used in appropriation or condemnation cases. (See, e.g., Glen & Mohawk Milk Assn. v. State of New York, 207 Misc. 1130, affd. 2 A D 2d 95.) The problems with respect to water storage and conditioning are discussed below. .
With respect to the value of the property subsequent to the appropriation, the proof established that without adequate water the claimant would be left with less land, a group of buildings of questionable usefulness and marketability for any other purpose, and specialized machinery worth little even as salvage. Although a certain amount of speculation is invariably involved in determining the value of a specialized factory after the supply of a vital resource has been destroyed, the court can find little or no basis in the proof presented for rejecting the residual or after value of $75,000 assigned by claimant’s expert.
Since the damages as thus determined ($301,600) exceed even the highest figure assigned to cost of cure ($284,000), the latter method has been adopted by the court.
The cost of cure proposed by the claimant involved the following:
Annual expense to Village of Fleischmanns
for water ............................. $7,000
Maintenance of water treatment plant...... 3,000
Total annual expense................. $10,000
Amount required to realize annual expense by capitalization @5%.................................. $200,000
Expense of connecting to village water supply...... 3,000
Construction of water storage tank................ 38,000
Plant for demineralization and dealkalinization of village water.................................. 43,000
$284,000
The annual expense of purchasing water was based upon amounts actually paid for water subsequent to the appropriation ($3,500 per year) and uncontroverted proof that an equivalent amount was ordinarily required and used in spraying logs to prevent a condition described as “checking” or discoloration of the wood. Due to a water shortage in the village, the 'spraying operation was not possible during the period immediately following the appropriation. Claimant’s president testified, however, that the annual loss from checking exceeded *1047 what the water for spraying would have cost if available, and his testimony to this effect was uncontroverted.
The annual expense of maintaining a water treatment plant was not controverted nor was the cost figure for such a plant. Although the State raised questions with respect to the necessity of such a facility, the source destroyed by the appropriation was shown to be uniquely suited to use in claimant’s operation from the standpoint of alkalinity and hardness. The proof also established that village or well water without prior treatment in all probability would cost, in the case of the boiler alone, a greater amount through reduction of useful life than the uncontroverted cost of dealkalinization and demineralization process.
The cure proposed by the State involved drilling a well and maintaining a standby connection with the village water supply. The only proof presented in support of this proposal consisted of the testimony of a local well driller that for $13,578.90 he would drill a well on claimant’s premises guaranteed to produce 50 gallons per minute. Although this amount would, with adequate storage facilities, supply claimant’s needs from the standpoint of quantity, no further proof was presented intending to establish any practical certainty of success. Claimant’s witnesses, on the other hand, testified that the feasibility of drilling a well had been considered and the conclusion was reached that too much speculation would be involved to justify the expense.
The basic issue raised by the proof involves the application of the principle that one who is injured by the acts of another has an obligation to minimize damages if it is reasonably possible to do so. (See, e.g., American Woolen Co. v. State of New York, 125 Misc. 186; 4 Nichols, Eminent Domain, § 14.22, p. 525.) Although this general principle is unquestionably well established, it is subject to two qualifications or subsidiary rules which affect its application to any given set of facts.
The first such qualification or subsidiary rule involves the determination of what is “ reasonably possible” within the meaning of the more general principle as above stated. Various verbal formulae have been enunciated by the courts and in treatises among which are statements that an injured party is by no means required “ to enter upon a doubtful and speculative undertaking for the reclamation of his property” (4 Nichols, Eminent Domain, § 14.22, p. 525), that an injured party is not required to take extraordinary or costly measures, the efficacy of which is doubtful (Leonard v. New York, Albany & Buffalo Electro Magnetic Tel. Co., 41 N. Y. 544); that there must exist a " practical certainty of success ” if the preventive *1048 effort is made (25 C. J. S., Damages, § 33, p. 501); that the preventive effort requires only “ a trifling expense or with reasonable exertions ” (Warren v. Stoddart, 105 U. S. 224, 229).
The second qualification or subsidiary rule is that the burden of proving facts minimizing or in mitigation of damages rests upon the party causing the injury (Hamilton v. McPherson, 28 N. Y. 72; Colrick v. Swinburne, 105 N. Y. 503; People’s Gas & Elec. Co. v. State of New York, 189 App. Div. 421; Matter of Mayor [West Farms Road], 47 Misc. 216, affd. 130 App. Div. 899). The case last cited also involved the destruction of a water supply and a contention by the condemning authority that damages should be limited to the cost of drilling a new well. In addition to discussing the quality of proof required, the court stated that (pp. 218-219): “To reduce the damages to the mere cost of digging a new well at some place upon the owner’s remaining land, rather than to be charged with the expense which would measure the owner’s loss in the purchase of water from others, the burden was obviously upon the city to show that a new well would in fact be a substitute for the old, in view of the legitimate uses to which it was put. * * *
The owner proved its special damage, in the first instance, by showing the use of the well for its business, the taking by the city and the cost of obtaining water elsewhere in the usual course, and for the adoption of some lesser measure of damage, special to the ease, through the finding that a substitute well was available, it became incumbent upon the city to prove the fact that there was an available substitute for the well which was taken.”
In the light of the foregoing and after close analysis of all the evidence presented, the court feels compelled to hold that the State failed to meet the burden of proof imposed upon it with respect to minimization of damages. Viewed most favorably to the State, the record indicates only a possibility that its proposed cure would, in fact, serve as a substitute for what had been taken from the claimant. The State had available to it means for establishing the feasibility of its suggested cure by competent proof. Apparently, however, it chose to proceed under the assumption that the burden of fully justifying the particular cure in fact adopted rested upon the claimant. The authorities cited above clearly indicate the error of this apparent assumption.
The determination of the court, therefore, is that the claimant is entitled to recover the sum of $284,000 with interest from March 15,1962 to the entry of judgment herein. In view of the fact that this sum represents the total of specific expenses *1049 itemized above as the “ cost of cure ”, it would serve no useful purpose to engage in the game of attempting to categorize the same as direct or consequential damages or some mixture of the two.
The claim was duly filed on January 18, 1962 and has not been assigned. The court has viewed the property.
The award to claimant herein is exclusive of the claims, if any, of persons other than owners of the appropriated property, their tenants, mortgagees and lienors having any right or interest in any stream, lake, watercourse, street, road, highway, or right of way or the bed thereof within the limits of the appropriated property or contiguous thereto; and is exclusive also of claims, if any, for the value of or damage to easements and appurtenant facilities for the construction, operation and maintenance of public service electric, telephone, telegraph, pipe and railroad lines.