NORTHERN NEW YORK POWER CORPORATION, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 726-A.)

Court of Claims, August 7, 1937.

*Francis E. Cullen, James B. Keogh, Charles A. Collin* and *Ralph I. Morse* for claimant.

*John J. Bennett, Jr., Attorney-General (Edward J. Mone, Sanford W. Smith, John D. Munroe, Richard E. Phillips* and *Charles E. McManus* of counsel), for defendant.

FRED M. ACKERSON, Official Referee Acting as Judge of the Court of Claims. The trial of this claim was commenced in this court in January, 1917. The trial was continued from time to time until January 9, 1918, when the attorneys for the respective parties hereto united in submitting to the court for decision,

before further proceeding with the trial, two preliminary questions, as follows:

First: As to whether or not the so-called waiver and release of April 14, 1910, which is Exhibit 126 in the case, is a valid instrument; and

Second: The question as to the nature and extent of claimant's water rights and privileges at this time.

The court thereupon acceded to the said joint request of counsel and requested them to file briefs covering the law and the facts necessary to be considered by the court in passing upon the two questions so submitted for decision. The respective counsel complied with the court's request in this regard and such briefs were filed with the court in February, 1919.

Thereafter in April, 1920, this court handed down an opinion setting forth its views at that time on the two questions submitted. This opinion is reported in 111 Miscellaneous 13.

The trial was then proceeded with and concluded at Rochester on the 2d day of October, 1923.

The counsel then agreed to submit their briefs and requests to find, after which it was agreed there should be an oral argument.

In the meantime the State had filed a counterclaim herein, dated October 1, 1922, demanding from the claimant $100,000 for each year since October 1, 1915, for the taking and use of excess water for power at the dam at Minetto over and above what it was legally entitled to use.

The State's final brief was filed on December 26, 1923, but the claimant's brief on the final hearing was not filed until March 26, 1935, and its supplemental brief was not filed until June 11, 1937.

The counsel for the respective parties argued the issues involved herein orally before the court at Syracuse on June 17, 1935, and before that time filed their requests to find.

We now come to the final decision of this important claim which for so many years has engaged the attention of this court.

In our preliminary opinion above referred to we made a statement in regard to the allegations of the claim under consideration and concerning the history of the relations of the claimant and its predecessors to the premises in question, which for convenience in referring to we incorporate in this opinion as follows:

[The court here quotes that part of the preliminary opinion printed at 111 Miscellaneous 13 which begins with the words " The counsel for the state " at the bottom of page 15 and ends on page 35 with the words " Such in brief is the history of the state's and the claimant's connections with the Oswego river at Minetto."]

We then proceeded to hold that the waiver and release of April 14, 1910, meant nothing at that time, so far as having any influence on the determination of the rights of the parties here, because it was based on an impossible hypothesis. We took this position because it appeared to us that the claimant had never been entitled to use all of the surplus waters of the river not necessary for the canal or for the purposes of navigation simply because its grantors were limited to such portions of that surplus as will pass through 540.5 square feet of openings in the dam at a head of seven and one-half feet and that none of them, therefore, could convey any greater interest.

We based that holding on what this court had held in reference to the rights of riparian owners on the Oswego River in a very similar case entitled *Fulton Light, H. & P. Co.* v. *State of N. Y.* and reported in 65 Miscellaneous 263. This decision was affirmed in 138 Appellate Division 931 and 200 New York 400.

We find the following statement in the opinion in that case, which also sets forth the conditions which existed at Minetto when the State invaded the premises of the predecessors of this claimant at the time it constructed the original Oswego Canal in about 1826. That portion of the opinion which we then thought should be controlling here reads as follows (65 Misc. 263, 281): "The rights of the parties must be determined by reference to the facts and the established decisions of the courts. The difficulty of determining the rights of the parties since the appropriations by the State for the old Oswego canal lies in the fact that no grant of land or water rights affecting these premises was made under the act of 1816 (chap. 237) and no appraisement was made pursuant to the act of 1817 (chap. 262); and, as there are no living witnesses to recount the actual transactions as they occurred at that time, reliance must be had upon the acts of the parties themselves, interpreted in the light of such documentary evidence as is available. One of the facts that assists in determining the rights acquired by the State and those that remained in the claimants is the statute under which the rights of way for the original canal were acquired. This statute, enacted in 1817, provided that the State might acquire such land and water as might be ' necessary ' for the canal, ' doing nevertheless no unnecessary harm.' Laws of 1817, chap. 262. It seemed to be the intention of this act that only such rights should be acquired by the State as were necessary for the proposed canal, and that in acquiring those rights no unnecessary harm should be done; but there is no grant or award showing what rights the State regarded as necessary, and recourse

must be had to what was actually done. * * * When it began the construction of its canal in 1825, claimants' predecessors were in possession of the uplands and owned the fee of the bed of the river. The State removed the wing dam, extending nearly to the center of the river, and in its place substituted a dam built across the river, furnishing a head of about twelve feet. It connected by a pier the east end of the dam with the east high bank of the river, allowed claimants' predecessors to rest their sawmill upon this pier, and placed openings in the pier for the supply of water to the mill and also to the old wooden flume which previously existed. * * * Although the appropriation made by the State was not followed by an appraisement, as required by the Statute of 1817 (chap. 262), the State acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal, reserving for the claimants' predecessors such portion of the remainder of the water as was available through the openings which it left in the pier. It was evidently thought at the time by claimants' predecessors that this supply of water, with the additional head furnished by the new dam, would compensate them for such damages as they sustained; and it does not appear that any effort was made, either by them or by the State, to secure an appraisement. Any objection rising from the absence of a grant or appraisement has long since been cured, and the title of both parties has become fixed by lapse of time. * * *

" Obviously it was not deemed necessary by the State to take from the claimants' predecessors all of the water of the Oswego river. This would have been accomplished, had the State constructed the dam and pier from bank to bank, without openings for the mill and flume; and, had this course been taken by the State, the claimants would not be in a position to insist that the State in building the barge canal should provide openings for the surplus water of the river. * * * If no openings had been left at the time of the appropriation, it might very well be claimed that the use of the water by the claimants was a mere license from the State; but under the circumstances it seems clear that the right to maintain the openings is a permanent one, growing out of the appropriation made when the canal was constructed and confirmed by subsequent acts. * * * Claimants' predecessors were compensated for the water rights which they lost when the wing dam was destroyed by the State by the appropriations made for the old canal, which allowed them to draw water from the river under the increased head provided by the new dam. Without this provision they would not have been

in a position as of right to claim the benefit of any increased head created by the erection of a dam higher than the original wing dam. Any power thus created belonged to the State, and they were not at liberty to draw upon this power without making a return to the State.''

Following this decision our preliminary opinion as to the rights of the parties herein was based on the assumption that after the building of the original dam at Minetto by the State, claimant's predecessors in title possessed no rights whatever to use the water at the easterly end of the dam for power, because no openings were left in the easterly end of the dam. And as to the westerly end of the dam we proceeded on the assumption that claimant's predecessors there were confined to the use of such portion of the surplus water of the river as could be passed through the openings left in the bulkhead at the head of seven and one-half feet made available by the original crest elevation of said dam. And while the evidence before us did not disclose the exact size of the openings in the westerly bulkhead of the original dam, yet we concluded that it must be presumed that the 540.5 square feet of openings placed in the westerly bulkhead of the 1870 dam were made in accordance with the rights of the parties. And, therefore, following the theory as to the rights of the parties which had been enunciated in the case of *Fulton Light, H. & P. Co.* v. *State of N. Y.* (*supra*), we concluded that the legal rights of claimant's predecessors in and to the water of the Oswego River at Minetto immediately prior to the commencement of Barge Canal construction there in 1910 were confined to such an amount of the surplus waters thereof as could be drawn through 540.5 square feet of openings in the bulkhead at the westerly end of the dam at a head of seven and one-half feet.

This theory or assumption as set forth in the opinion in this court in the *Fulton Light, Heat and Power Company* case (*supra*), as to the rights of the parties, which we endeavored to follow, was not based on any oral or documentary evidence or testimony as to what took place between the State and the riparian owner at the time the Oswego Canal was constructed and the original canal dam was erected. That was the situation in the *Fulton* case and it is likewise the situation in the claim before us. There is no record of what took place at Minetto except the dam itself.

With that situation before it in the *Fulton Light, Heat and Power* case (*supra*), this court, judging from what was actually done there in the way of canal construction, based its theory and

assumptions as to the rights of the parties after such construction upon the supposition that such theory and assumptions represented the actual agreement between the State and the riparian owner made at the time of such construction.

Now, after a careful re-examination of the questions involved we have reached the conclusion that the supposition on which this court based its conclusions as to the extent of claimant's water rights, both in the Fulton Light, Heat and Power Company claim as well as in the claim now before us, is untenable and not in accordance with the legal rights of the riparian owner whose property and privileges were interfered with when the original canal was built.

The claimant's attorneys herein, in their brief, state as follows as to the manner in which the State acquired its rights at Minetto, to wit:

" No gift nor grant to the State by any of claimant's predecessors in title has been found. No award was ever made to any of claimant's predecessors in title for appropriations made nor damages done. (Report of Canal Appraisers dated Jan. 13, 1849, S. M. 1063–1064. Stipulation as to no awards, S. M. 2188); so that all the rights which the State acquired at the time of the original canal construction were acquired by entry, use and occupation, as sanctioned by the acquiescence of claimant's predecessors.

" From these facts after a lapse of nearly ninety years and in the absence of other evidence, the Courts will infer an agreement between the State and the riparian owner, whereby the State obtained title to the lands occupied by its structures with the necessary flowage and pondage privileges, and the right to use so much of the water of the river as was necessary for the operating of the canal and whereby the claimant's predecessors reserved for themselves all their remaining rights, title and interest, including the right to use the unappropriated water through the openings in the dam bulkhead and under the improved conditions, including increased head of water which the State had brought about as a necessary incident to its work."

As we understand now the statement is substantially correct.

It will be noted that the opinion in this court in the said *Fulton Light, Heat and Power Company* case (*supra*) contains this language: " *the State acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal* ". (Italics supplied.)

That statement we believe to be absolutely correct and it is sustained by the language of the legislative act authorizing the canal construction and the holding of the Court of Chancery in *Varick* v. *Smith* (5 Paige Ch. 137, 9 Paige Ch. 546).

But then the opinion continues, " *reserving for the claimant's predecessors such portion of the remainder of the water as was available through the openings which it left in the pier.*" (Italics supplied.)

With that statement we cannot now agree. We adopted it and followed it in our preliminary opinion herein but upon further consideration, and after a careful re-examination of all the questions involved, we have reached the conclusion that it is not a correct statement of the rights of the State and this claimant to the use of the water at the State dam at Minetto.

The case of *Varick* v. *Smith* (*supra*) involved the right of the State to lease the surplus waters at a State dam to third parties and to exclude the riparian owner Varick at the westerly end of the dam in question from any beneficial use of the same. The Court of Chancery declared such lease to be void. That decision has never been overruled and never questioned except in an indirect way by the final decision in this court in the *Fulton Light, Heat and Power Company* case (*supra*).

As the law laid down by the Court of Chancery in the case of *Varick* v. *Smith* (*supra*) and the interpretations there placed upon the legislative acts authorizing the construction of the Oswego Canal are in our opinion decisive of the claimant's water rights here, we quote from the opinion in that case at some length, as follows:

At page 558 of volume 9 of Paige's Chancery Reports, Vice Chancellor GRIDLEY, after stating the facts in the case and holding among other things that the riparian owner Varick owned the bed of the river to the center of the stream subject to the right or easement of the public known as a " right of passage ", proceeded as follows:

" The way is now prepared for the inquiry, how far the rights of the complainant as riparian proprietor, and of those under whom he claims, have been affected by the erection of the state dam in the Oswego river. It appears by the evidence that in 1824 or 1825, the canal commissioners caused the state dam to be erected, across the Oswego river, for the purpose of raising a supply of water for the Oswego canal, constructed on the east side of that river; that a body of water is elevated some 10 or 12 feet high by this dam, * * * which, of course, is not necessary and cannot be used for the supply of the canal. * * *

" The defendant's counsel insist that all the land covered by the dam and by the water therein, and the land upon which the water falls, must be regarded as having been appropriated by and as now belonging to the State; and that as the complainant purchased after the erection of the dam, he never obtained any interest in the land so appropriated. This proposition involves a most important and interesting question in relation to the relative rights of the state and private citizens. It is an incontravertible proposition, that the government has no power to take the private property of a citizen, except for public use. Such was the doctrine of the civil law, and such has ever been held to be the doctrine of the common law, both in England and in this state. * * * The constitutions of the United States and of this state have placed a further safeguard around the principle of private right, and have provided that private property shall not be taken for public use without just compensation. No statute law, therefore, which clothes the agents of the State with powers inconsistent with these great constitutional principles, is valid; and no act of the canal commissioners, in conflict with these principles, whether sanctioned by an act of the legislature or not, has any binding force. The powers of the commissioners, as to the appropriation of land and property in the construction of the Oswego canal, were the same with those conferred by the act entitled ' An act respecting navigable communications between the great western and northern lakes and the Atlantic ocean.' (Laws of 1817, p. 300.) By the third section of that act the commissioners were authorized ' to enter upon, take possession of and use all and singular any lands, waters and streams *necessary* for the prosecution of the improvements intended by the act,' &c., and to make all such canals, feeders, dykes, locks, dams and other works and devices as they might think proper for making said improvements, *doing nevertheless no unnecessary damage.* What then, under the provisions of this act, in the case under consideration, was taken and appropriated for public use? '' (The italics are ours.)

That is the precise question we have before us in the *Northern New York Power Corporation* claim.

The answer to that question by the Vice Chancellor should have great weight with us now.

What was his answer? It was as follows: " In other words, they took all the land and water *necessary* for the furnishing of an adequate supply of water for the Oswego canal." (Italics supplied.)

The Vice Chancellor then proceeds to point out that the moment the water escaped over the top of the dam, that at that moment "it had ceased to be consecrated to the public use. * * * The public property in it had ceased to exist; and in my judgment, the right of the riparian owner, which had been suspended, revived and reattached to it in full force, subject to no restriction, except that servitude to public interest, for the general purposes of navigation, which existed before the erection of the dam. * * * And as this dam was erected by the state, it became public property, so that no person possessed the right of drawing off any portion of the accumulated water, through the dam itself, by inserting a flume and gate in it; for that would involve a trespass upon the property of the state. This consideration, however, does not affect the right of the riparian owner to the water after its escape over the dam. That depends solely on the right of the state to appropriate the property of a citizen to any other purpose than public use. That is a right which does not exist, and cannot lawfully be enforced either with or without a provision for compensation. The government has the power, under the constitution, to appropriate the private property of its citizens, just so far and no farther than is necessary for the purpose and object of the appropriation * * * . But when such purpose is accomplished, the right of the state is exhausted, and the whole of the residue of the property, whatever it may be, belongs to the citizen."

Then the Vice Chancellor summarizes as follows: " In this particular case the state has the absolute and exclusive right to the land on which the dam is built, and to the dam itself. It has also an absolute and exclusive right to so much water as is necessary to be diverted for the supply of the Oswego canal, and by necessary consequence it has a temporary and usufructuary right to all the water in the dam, as a means of keeping an adequate supply for actual diversion. And it has a partial right to the land on which the water flows; that is, a right to have the water fall upon it. The state, therefore, may lawfully appropriate the property of the individual owner to this extent, by making proper provisions for compensation for the damages sustained. Beyond this, I apprehend the power of the government does not extend; and all right to the property, or to the use of it, which is not thus appropriated, may be enjoyed by the original owner of it or by his grantees."

And so the court held that the person owning the land adjacent to the State dam at the time of the execution of the lease of the surplus waters was then entitled to have such surplus waters

flow over the dam for his use, and that the complainant Varick having succeeded to his rights is now entitled to have the surplus waters flow over the State dam and to use them in their descent to the bed of the stream if he can do so without injury to the navigation of the river. And so the court said, as to this lease of surplus water at this State dam to the lessors of the defendant G. Smith by the Canal Commissioners, that they "exceeded their authority."

The Vice Chancellor then rendered his decision as follows: "The decree will therefore declare the rights of the complainant in accordance with the principles above advanced, and will declare the lease void so far as it assumes to convey the right to draw the surplus waters from the dam, thus preventing or diverting them from their descent to the stream below; and it will also enjoin the defendant from thus drawing or diverting said waters."

With this conclusion the Chancellor concurred.

Under this holding the State at Minetto took only such water as was *necessary* for the purposes of the Oswego Canal. The use of all waters not necessary for the purposes of the Oswego Canal and navigation therein was a right that remained in and belonged to the riparian owners irrespective of any openings left in the dam.

The riparian owner was compensated for the loss of some of the water he was entitled to use before the State came upon the scene, by the increased head at which he was permitted to use the surplus waters by reason of the State dam. The amount of this surplus water was necessarily variable. In the flood stage of the river it was very large. In dry weather when the river reached the extreme low stage it was much reduced. The openings in the State dam first constructed were apparently fixed at a size which it was thought at that time was adequate for the needs of the predecessors of this claimant as they then existed. What we now wish to emphasize is that in our opinion there was no fixation of rights because of the openings left in the westerly bulkhead of the original State dam at Minetto except the right of the riparian owner to use the surplus water for power at the head created by the State dam.

The surplus water, not necessary for the canal, the original riparian owner had the right to use as a matter of law. That was the right he enjoyed as a riparian owner. When the State constructed its dam on his property and either took away his wing dam or made it impossible for him to construct such a dam there, it compensated him for such loss of his rights by

permitting him to utilize the surplus water that he was entitled to use through openings in the State dam and at the head afforded by that dam.

The only significance of the openings left in the dam was that they represented an agreement between the State and the riparian owner that the surplus waters might be utilized for power at the head created by the dam.

It was absolutely impossible from the very nature of things for the State to make any agreement that the riparian owner could have any definite amount of water all the time. The State under the law was entitled to sufficient water to operate the canal; the riparian owner was entitled to the use of all the rest of the water in the river, much or little. That was as definite as the rights of the parties could be stated and any agreement to the contrary cannot be assumed because it would violate the statute and what the Court of Chancery has held were the rights of the parties under the statute.

Owing to the fact, therefore, that the statute under which the Canal Commissioners acted authorized them to take only such water as was " *necessary* " for the canal; and owing to the fact that ever since the decision of the Court of Chancery in *Varick* v. *Smith* (5 Paige Ch. 137, 9 Paige Ch. 546, *supra*) it has been regarded as settled law that the riparian owner retained his full rights to the use of all of the surplus water *not* necessary for the canal, we can see no escape from the conclusion we have reached that the openings in the end of the dam cannot be regarded as fixing the amount of the surplus water which the riparian owner was entitled to use. On the other hand they are an indication that it was agreed by the then riparian owner and the State that he might use the head available at such dam for the loss of his wing dam or his right to erect one. This we think is more consonant with the plain provisions of the statute under which the canal was constructed and the holding of the Court of Chancery in *Varick* v. *Smith* which has never been overruled.

This conclusion which we have now reached seems to be in accord with what this court held in its preliminary decision in the case of the *Fulton Light, H. & P. Co.* v. *State* (62 Misc. 189, 219, 225–226, *supra*) which was made in January, 1909, and in which the court said: " Private enterprise had developed to some extent the water power on the Oswego river before the State constructed the Oswego canal. In order to supply itself with sufficient water to operate the canal it constructed dams at different points. In the early history of the Oswego canal, prior to the case of *Varick* v. *Smith,* the right to sell

the surplus water created by the construction of these dams was raised; and statutes were passed and various acts were done by the State officers on the assumption that the State owned the surplus water thus created. Meanwhile, controversies had arisen between the State and riparian owners which were set at rest by the case of *Varick* v. *Smith*; and, since the decision in that case, the State has uniformly recognized the rights of the riparian owners to the surplus water not needed for the operation of the Oswego canal. * * * Further recognition by the State of private ownership is shown by awards made by the predecessors of this court, the board of claims, and the canal appraisers. * * * Reference to these awards show that, while the State prior to the decision of the Varick case in 1842 assumed to own the surplus water of the Oswego river where it had constructed dams, executing leases and receiving payment therefor, after the decision in that case it acquiesced in its binding force, recognized the rights of riparian owners and in some cases reimbursed the lessees."

That court there seemed to recognize what had been declared by the Legislature in the statute giving authority to the Canal Commissioners and by the Court of Chancery in *Varick* v. *Smith* (*supra*) that only such water as was *necessary* could be taken for the canal and that the use of all the surplus water beyond that belonged to the riparian owner.

However, when the same court handed down its final opinion in that case in December, 1909, it enlarged on its previous declaration on the subject and conceived the theory as it there expressed it as follows: " The difficulty of determining the rights of the parties since the appropriations by the State for the old Oswego canal lies in the fact that no grant of land or water rights affecting these premises was made under the act of 1816 (chap. 237) and no appraisement was made pursuant to the act of 1817 (chap. 262); and, as there are no living witnesses to recount the actual transactions as they occurred at that time, reliance must be had upon the acts of the parties themselves, interpreted in the light of such documentary evidence as is available. One of the facts that assists in determining the rights acquired by the State and those that remained in the claimants is the statute under which the rights of way for the original canal were acquired. This statute, enacted in 1817, provided, that the State might acquire such land and water as might be ' *necessary* ' for the canal, ' *doing nevertheless no unnecessary harm.*' Laws of 1817, chap. 262. It seemed to be the intention of this act that only such rights should be acquired

by the State as were necessary for the proposed canal, and that in acquiring those rights no unnecessary harm should be done; but there is no grant or award showing what rights the State regarded as necessary, and recourse must be had to what was actually done. * * * Although the appropriation made by the State was not followed by an appraisement, as required by the statute of 1817 (chap. 262), the State acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal, reserving for claimant's predecessors such portion of the remainder of the water as was available through the openings which it left in the pier. It was evidently thought at the time by claimant's predecessors that this supply of water, with the additional head furnished by the new dam, would compensate them for such damages as they sustained; and it does not appear that any effort was made, either by them or by the State, to secure an appraisement. Any objection arising from the absence of a grant or appraisement has long since been cured, and the title of both parties has become fixed by lapse of time." (*Fulton Light, H. & P. Co.* v. *State of N. Y.*, 65 Misc. 263, 281.) (Italics supplied.)

The situation as to the rights of the State and the riparian owner is the same in the *Northern New York Power Corporation* claim as in the foregoing *Fulton* case (*supra*). In our preliminary determination as to the rights of the parties we adopted what the court had held in the *Fulton* case and followed it as an authority reaching our decision in the case at bar. (See *Northern N. Y. P. Corp.* v. *State of N. Y.*, 111 Misc. 13, *supra*.)

Our conclusions reached now after a re-examination of the questions involved compels us to modify the holding we then made as we have indicated.

In view, therefore, of the fact that we have no written record of the transactions between the State and the riparian owner at Minetto when the first State dam was constructed with openings through the western end thereof, and " as there are no living witnesses to recount the actual transaction " we think we are justified in the light of all the facts developed on the trial in adopting the theory that there was an adjustment by agreement between the State and the riparian owner or owners, inferable from the facts, rather than an arbitrary proceeding by the State, *in invitum,* in the exercise of its right of eminent domain and that the State's acquisition of land and waters was limited by the needs of the canal, leaving the riparian owner in possession and enjoyment of all that remained of his property after satisfying those needs.

This theory is confirmed in what Judge GRAY said in his opinion in the Court of Appeals in affirming the decision of the Court of Claims. His language is as follows: " So far as it appears, the State had at no time sought to appropriate, *in invitum,* any rights of the claimants' predecessors in title, whatever they were; but, rather, had, from the time of the enactment of statutes bearing upon the construction of the Oswego canal to the enactment of the present Barge Canal Act, reserved, if it had not recognized, those rights." *(Fulton Light, H. & P. Co.* v. *State of N. Y.,* 200 N. Y. 400, 411.)

I quote this because the situation before us in the *Northern New York Power Corporation* claim is practically the same as it was in the *Fulton* claim so far as the method of ascertaining the rights of the parties are concerned.

I quote it also because it is an affirmance of the decision of the Court of Claims in that case. However, it does not mention the theory advanced by the Court of Claims that the openings left in the dam or pier by the State must be taken to indicate that all the surplus water is taken from the riparian owner except that portion of it that will pass through such openings. In fact, what I have quoted from Judge GRAY's opinion, at page 411, seems to be against such a theory.

Five years after the Court of Claims handed down its opinion in the *Fulton Light, Heat & Power Company* claim its author Judge RODENBECK, who had retired from the court, rendered an opinion to the then owners of the property at Minetto involved in the claim of the Northern New York Power Corporation, as to their title and water rights.

At that time, December 24, 1914, as appears from a printed copy of that opinion filed with this court upon the submission of this claim, Judge RODENBECK among other things wrote as follows:

" Not only is the State limited to the actual improvement of the navigability of the stream where it undertakes to make changes in the flow of the stream without making compensation therefor but in making any other improvement such for instance as the construction of a canal along or in a stream, *the State can appropriate only such water as is necessary, and any surplus is subject to such use as the owner of the upland can make of it.* The State cannot arbitrarily appropriate more water than is necessary for a canal improvement but must leave any surplus water to private owners unless they voluntarily relinquish its use *(Silsby Mfg. Co.* vs. *State,* 104 N. Y. 562). Any other view would enable the State to transfer private property from one

individual to another by appropriating more than was necessary and disposing of the surplus to private parties for public gain. * * *

" Under these appropriations the State has taken merely such water as is necessary to operate and maintain the improved Oswego Canal. This is all the water that it could take constitutionally for the State has no right to take any more water than is necessary for the purposes of the new canal. The surplus waters would remain in the private owners.

" The reservation in the notices of the appropriation to the owners of the surplus water of the river was hardly necessary in view of the limitation upon the power of the State to appropriate more water than was necessary for the improved canal, but the disclaimer in the notices of appropriation show that the State intends that the Minetto-Meriden Company and its successor, the Columbia Mills, Inc., should be permitted to use this surplus water."

It is plain, therefore, that in this opinion written for the owners of the property now in question in the *Northern New York Power Corporation* claim and which was written five years after he wrote the opinion in the *Fulton Light, Heat and Power Company* claim, Judge RODENBECK had finally reached the same conclusion that we have now arrived at, that the apertures or openings left in the original State dam do not limit the amount of water that the riparian owner is entitled to use. He is entitled, as a matter of law, to the use at all times of all the surplus water not needed for the canal regardless of the size of the openings the State has seen fit to place in the dam. The definite proposition established by the openings in the dam is that the riparian owner was given permission by the State to utilize his surplus water at the head established by the dam. This increased head over and above any head available to the riparian owner which he could create within the limits of his own property more than compensated him for the loss of any water taken for the canal.

We have quoted at some length from these opinions of Judge RODENBECK as he is undoubtedly the most eminent living authority on the respective rights of riparian owners and the State in and to the waters of Oswego River.

The foregoing holding which we now make in regard to the claimant's right to the use of all the surplus waters of the Oswego River not necessary for the canal at the State dam at Minetto at the head made available by that dam is supported and in accordance with what the Appellate Division and the

Court of Appeals have recently held in the case of *Oswego River Realty Corp.* v. *Sweet Bros. Paper Mfg. Co.* (272 N. Y. 505), which modified the judgment of the Appellate Division in the same case under the name *Dunlop* v. *Sweet Bros. Paper Mfg. Co.* (243 App. Div. 855), as we understand those decisions and as the facts are stated concerning the same in the claimant's supplemental brief on preliminary issues filed in this court on the 11th day of June, 1937.

Having arrived at the conclusion that the claimant is entitled to the use of all the surplus waters at the State dam at Minetto not needed for the canal which it is free to use for the development of power through the openings in the westerly bulkhead of the New State dam at the head afforded by that dam of about seventeen and one-half feet, we now come to the question of damages which the claimant may be entitled to receive from the State by reason of appropriations made by the State of claimant's property, and by reason of the State's interference with claimant's water rights at Minetto while engaged in Barge Canal construction and also by reason of the structures which it has erected there.

The damages contended for by the claimant are as follows:

1. Damages for the appropriation of 0.25 or one quarter of an acre of land on the river bank and covered by appropriation Map No. 2878 on which claimant's witness places a value of $3,400. Claimant requests a reasonable amount for removing buildings therefrom, not appropriated.

The State concedes that it would cost $400 to remove the buildings on this parcel and as these are direct damages the claimant would be entitled to the sum of $3,800 on this item, unless it is held that the claimant has waived these damages by executing the waiver and release of April 14, 1910.

2. Damages for 11.88 acres in the bed of the Oswego River at Minetto appropriated by the State from the claimant under Appropriation Maps Nos. 2910 and 2910-A. The State structures rest on 2.63 acres of this appropriation, leaving 9.25 acres in the bed of the river not occupied by State structures.

This is a direct damage also that cannot be offset by benefits. We hold that this land in the bed of the river has only a nominal value for which the claimant would be entitled to an award of $1,000, unless this damage has also been waived by the claimant in executing the waiver and release of April 14, 1910.

3. The claimant demands further damages for the additional amount of water appropriated for the Barge Canal over that formerly taken for the Erie Canal.

As to this item we hold that there is not sufficient evidence in the case to sustain a demand for damages under it and the same, therefore, must be dismissed. As yet the State has certainly not taken any more water than it did for the old canal and the progress in methods of transportation is now away from and not toward canals as common carriers.

4. Claimant demands from $9,500 to $10,000 for the rental value of a switch track one-half mile long and a five-acre piling space used by the State's contractor while constructing the Barge Canal Works at Minetto. The claimant consented to the use of this property by the State's contractor free of charge and did not exact or expect any rent therefor. The Attorney-General in Point IV of his brief makes a complete answer to this item of the claim and closes his statement about it with this language: " The State or its contractor having used this property with the express permission of the owner, and action to recover the damages, if any, resulting from a trespass will not lie; and there being no lease or relation of landlord and tenant existing between the State and the M. M. Co., an action for rent will not lie. Moreover the agreement under which the property was entered upon and used expressly provided that the property might be used ' free of charge '; and inasmuch as the relation of landlord and tenant did not exist, and the circumstances surrounding the user conclusively negative an intent to exact compensation for the use thereof, an action for use and occupation will not lie. (39 Cyc. 849–856; *Collyer* vs. *Collyer*, 113 N. Y. 442). The law cannot imply a contract to pay rent contrary to the intention of the parties or in the face of the contract provisions that the property may be used ' free of charge '."

We think the Attorney-General's position is well taken and that it is supported by the evidence in the case and that this item of claimant's claim must be dismissed in any event.

5. Claimant demands the sum of $100,000 damages because it claims the construction of the new State dam at Minetto known as Dam No. 5 compelled the destruction of its old hydroelectric plant. We do not consider such to be the fact. The engineering witnesses have testified that this old plant could have been adapted to the new conditions caused by the new dams by an expenditure of about $55,000. They say, however, that it would not have been wise to do that; that the prudent and advantageous thing to do under the circumstances was to remove the old hydroelectric plant and construct a new one in its place that could make full and economical use of the new head and the larger amount of water available by reason of the 3,000 square feet of openings in the new dam which took the place

of the 540.5 square feet of similar openings in the old dam. This was done and a new power house erected at a cost of $650,000 which had a capacity of 12,000 horsepower instead of 400 to 500 horsepower developed by the old plant which was discarded.

The situation here is in all respects similar to that which was before us in the case of *American Woolen Co.* v. *State of New York* (125 Misc. 186).

There as here the State raised the crest of two dams, one above and one below the water power plant of claimant; there as here claimant had to adjust its old water power machinery to the new level of the river created by the dams or erect a new plant. In both cases it erected a new hydroelectric plant with a greatly increased capacity in order to fully avail itself of the increased head made possible by the new construction. There the head was increased only two feet while here it is increased over ten feet. And not only that, but this claimant instead of drawing water through bulkhead openings containing 540.5 square feet, as we have already pointed out, is now drawing water through bulkhead openings containing 3,000 square feet; and instead of developing from 400 to 500 horsepower is now developing 12,000 horsepower.

Here the benefits to the claimant from the new State construction are so overwhelming as to preclude any consideration of damages alleged to have been suffered by claimant except for the land of claimant actually appropriated on the bank and in the bed of the river.

What we said in the *American Woolen Company* case (*supra*) in regard to the effect of the dam construction upon the claimant's water rights applies here except that we are now holding that the claimant here is entitled to all of the surplus flow of the river, over and above what is required for the canal and the purposes of navigation, and is not limited to the use of such portion of the surplus water as could pass through the openings left in the old dam.

We quote as follows from what we said in that case on this subject (125 Misc. 186, 206):

" These rights, of course, did not vary with the rise and fall of the surface elevation of the stream. It did not matter, therefore, what change the State made in the surface elevation of the river, so long as it preserved to the claimant the flow and head to which it was entitled. Inasmuch as the new bulkheads will pass more water than the old ones, because of the increased elevation of the crest of the dam; and inasmuch as a great deal more power can now be developed from this water by the claim-

ant than heretofore, because of the increased head at which it can be used by reason of the new dam, it is plain that claimant's water rights have not in any way been ' taken,' ' destroyed,' ' appropriated ' or even ' diminished.' Claimant was entitled, it is true, to the use of the stream at the particular level to which its machinery was adjusted. The change of that level caused by the appropriation of an easement to permanently flood some of its upland, necessitated a slight change in the adjustment of its water power machinery. This was a temporary interference with the use of its water power rights incident to the appropriation aforesaid. It was a damage for which claimant must be compensated. But under all the rules of law, as we understand them, it was a consequential damage. (*Kerr* v. *Joslin,* 20 N. Y. Supp. 929; *Chase-Hibbard Milling Co.* v. *City of Elmira,* 207 N. Y. 460; *Atwater* v. *Trustees of Canandaigua,* 124 id. 602.)

'' The claimant might have readjusted its old, obsolete, inefficient machinery to the new level of the river and the cost of doing so and of supplying the necessary substitute power while the change was being made would represent the amount of its consequential damages caused by the appropriation of the easements in the land as aforesaid. The claimant contends that the cost of the readjustment would have been $173,400. The State's expert says it would have cost $8,000. We believe that $15,000 would have been ample for this purpose. It would have taken as we conclude from the evidence not to exceed four months to make this readjustment and the cost of furnishing the necessary substitute power for that time would have not exceeded $10,000. As claimant received benefits from the new construction worth $100,000 such benefits offset and are far in excess of such consequential damages. But the claimant had no consequential damages. It had only consequential benefits. It did not discard all of its old water wheels, wheel pits and strengthen the walls of its forebay, because it was compelled to do so by the operations of the State. It would have done so in any event. Even though those structures had been perfectly secure and even though all its old water power machinery could have continued to operate unhampered by this increase in head, yet the claimant would have discarded it just the same. The claimant could not, with the new head furnished by the State, make an economical use of its water with the old machinery. Only a portion of the power now available could be so utilized. For its own purposes, for its own enrichment, for its own necessities, the claimant was compelled to take out its old antiquated water power machinery and substitute therefor

a new hydro-electric plant. The State did its part in making a larger water power available on claimant's premises. Such work on the part of the State was, it is true, incidental to its canal operation, but it is just as valuable to this claimant as though the work was performed for the specific purpose of augmenting claimant's water power. The State cannot be charged with destroying property of the claimant, when the claimant was compelled to discard such property for its own business purposes."

6. Cost of installation and operation of temporary steam plant made necessary by canal construction which temporarily deprived claimant of water power.

Under this item claimant demands: (a) for installation of temporary steam plant $18,654.33; and (b) for cost of operation of same $52,783.91.

The damages demanded under this item like those demanded under the preceding item are consequential in nature and far exceeded in amount by the benefits which the claimant has derived, is now deriving, and will continue to derive for an indefinite time in the future from the greatly increased head at which it can use the surplus water not needed for the canal by reason of the new State dam.

Our decision in the claim of *American Woolen Co.* v. *State of New York* (125 Misc. 186, *supra*), where we held that exactly such damages as are here contended for were offset and overcome by the benefits which the claimant derived from the increased head at which it could utilize its water for power owing to canal construction, must be followed here. The situations are identical. This item must be dismissed, therefore, as the claimant has already been compensated therefor by the benefits received from the State through its Barge Canal construction at Minetto.

7. Claimant's seventh demand for damages is:

(a) The cost of installing and operating a temporary water intake in the river above the State's cofferdam while the State construction was in progress. Amount claimed under this item, $5,934.35.

(b) The ponding of Everts Creek in order to have a dependable water supply during State construction operations. Amount demanded, $7,854.

These items also represent consequential damages which are offset by benefits and must, therefore, be dismissed.

8. The last item of damages contended for by the claimant is for the sum of $240 expended in constructing a new sewer from the Sizer building made necessary by the elevation of the upper

pool. This is in the same category as the preceding item and being for consequential damages is offset by benefits.

We now come to the question as to what disposition we should make of the State's counterclaim.

This counterclaim is based on the proposition that the limit of claimant's right to the use of water at the State dam was such an amount, " quantity or volume of water not exceeding that which could be drawn or passed through an opening in the dam with a cross sectional area of not to exceed 540.5 square feet below 297.3 b.c.d., that is 297.3 feet above mean sea level, and, when so drawn or passed, economically employed or utilized for power or other purposes " (the part quoted is the language of the counterclaim); that subject to such right the State possessed the exclusive right to use the entire residue of the surplus flow of the river. The counterclaim further states that since October 1, 1915, the claimant has drawn from the dam and utilized for power a quantity of water in excess of that to which it was entitled, to wit: such quantity as could be passed through an opening having an area of 3,000 square feet at a head of about seventeen and one-half feet, and thus has converted to its own use such a quantity of water as could be passed through an opening having an area of 2,459.5 square feet in excess of the quantity to the use of which it was entitled and at a head of seventeen and one-half feet instead of a head of about seven and one-half feet.

The counterclaim then demands from the claimant for the use of this excess water an annual rental of $100,000 for each year since October 1, 1916, with interest.

On November 3, 1922, the claimant filed its reply to the State's counterclaim, admitting that since October 1, 1915, it drew water from the State dam at Minetto through bulkhead openings having an area of 3,000 square feet and utilized the same for power and denying all other allegations in the counterclaim.

The claimant contends among other things that the counterclaim must be dismissed on two grounds.

First: Because the surplus water would have run to waste if claimant had not used it, as the State had no use for it.

Second: The claimant contends that the State has not proven that it has used more water than would pass through an opening containing 540.5 square feet under a seven and one-half foot head.

It is quite possible that the court would have been compelled to dismiss the counterclaim on one or both of the foregoing grounds stated in the reply.

Now, however, as we take the position that the claimant is entitled to the use of all the surplus water at the Minetto State dam, known as Dam No. 5, not needed for the canal or purposes of navigation, there is nothing left on which to base the counter-claim and it follows as a matter of course, therefore, that it must be dismissed.

We may summarize as to our decision on claimant's various demands for damages as follows:

Without taking into consideration the waiver and release of April 14, 1910, we find that:

1. For the permanent appropriation of Parcel No. 2878 claimant is entitled to $3,800.

2. For the permanent appropriation of Parcels Nos. 2910 and 2910-A, claimant is entitled to $1,000.

3. For the appropriation of additional water for the Barge Canal over and above the needs of the old canal nothing is allowed. The evidence does not sustain any claim for damages for such an alleged appropriation. Indeed there is much to the State's claim that the Barge Canal puts more water into the Oswego River than it takes out and there is absolutely no evidence in the case that more water has been taken by the Barge Canal from the river than was taken by the old Oswego Canal or that there ever will be. If such a time ever arrives the claimant will then be free to file its claim for such compensation as it may then think it is entitled to.

4. For the use by the State's contractor of switch track and piling space of the claimant we allow nothing, for reasons which we have fully set forth above.

All of the balance of claimant's demands are for damages which we hold to be consequential in nature and more than offset by the benefits received.

As we have already intimated, the benefits conferred upon claimant by increasing the openings in the dam through which it can and does draw water for power from a size of 540.5 square feet to openings containing 3,000 square feet; and increasing the head at which it could utilize the water for power from seven and one-half or eight and one-half feet to seventeen and one-half feet, thereby enabling it to develop and utilize for its own financial betterment and gain 12,000 horsepower instead of the 400 to 500 horsepower which it was enabled to develop under old conditions, describes a benefit conferred upon this claimant far greater in monetary value than all of the damages combined which it alleges that it has suffered by reason of Barge Canal appropriations and constructions.

The claimant has already conceded this fact to be true by its solemn voluntary statement made in its waiver and release of April 14, 1910, as follows:

" And whereas, the location of the dam and other works at Minetto pursuant to the plan of said improvement as adopted by the said advisory board of consulting engineers is, in case the Minetto-Meriden Company should be adjudged the owner of the surplus waters of the Oswego River at this point, of itself alone a benefit fully equal to the compensation to which the Minetto-Meriden Company would be entitled by reason of the appropriation of, and damage to this property as aforesaid in connection with said Barge Canal;

" And whereas, the parties hereto are mutually desirous that said benefits of location accruing to the Minetto-Meriden Company as above mentioned shall be offset against and accepted in full payment and satisfaction of said Minetto-Meriden Company's claim against the State for compensation or damages as aforesaid, in case the Minetto-Meriden Company and not the State of New York shall hereafter be determined to be entitled to use that portion of the water impounded at said new Minetto dam not required for the Barge Canal or purposes of navigation ".

Further than that as to benefits we have the uncontradicted testimony given by the State's witness Mr. Horton, a very eminent engineer, on that subject.

He based his testimony on three different assumptions.

1. Assuming on July 25, 1912, this property was limited to the use of 425.5 square feet of bulkhead openings at a head of 6.58 feet the property was worth ..................................... $251,000

After the improvement with no increase in the measure of its water rights expressed in terms of c.f.s. and no vested right in the increased head the value was............................... 610,000

or an increase of.............................. 359,000

2. Assuming 465.5 square feet of bulkhead openings with head of 7.25 feet:

Value before improvement........................ 320,000

Value after improvement.......................... 708,000

Increase ........................................ 388,000

3. Assuming 540.5 square feet of bulkhead openings and head of eight and one-half feet the property was worth before improvement................. 462,000

After improvement .............................. 870,000

Increase ...:................................... 408,000

But if he had assumed, what we now hold, that the claimant is entitled to the entire surplus flow of the river at the head created by the new dam, without any decision in regard to head except that the claimant is entitled to use the head available at Dam No. 5 so long at least as the crest of such dam is maintained at its present elevation by the State, then and in that event his testimony as to the increase in value must of necessity have been for a very much larger increase, probably in excess of one million dollars.

Now, last and finally, what effect shall we now give to the waiver and release of April 14, 1910?

In our preliminary opinion we spoke of it as follows:

" Upon an examination of this instrument we find that it is predicated upon the establishment of three preliminary propositions:

" A. The payment to the Minetto-Meriden Company of one dollar by the state of New York.

" B. The construction and maintenance of Barge canal improvement in the Oswego river between Fulton and Oswego in accordance with the general plan prepared by the state engineer as set forth in the resolutions adopted by the advisory board of consulting engineers on the 22nd day of March, 1910.

" C. That the Minetto-Meriden Company and not the state of New York shall hereafter be determined to be entitled to use that portion of the water impounded at said new Minetto dam not required for the Barge canal or purposes of navigation.

" The receipt of the one dollar by the Minetto-Meriden Company is acknowledged; the Barge canal improvement between Fulton and Oswego was constructed and is being maintained as contemplated by the resolution of the advisory board of consulting engineers referred to; but this court cannot determine that the Minetto-Meriden Company is entitled to use all the water impounded by the new Minetto dam not required for the Barge canal or purposes of navigation.

" Therefore, as one of the three conditions upon which said waiver and release is predicated is wanting, we must hold that it is, therefore, inoperative." (*Northern N. Y. Power Corp.* v. *State,* 111 Misc. 13, 46, *supra.*)

But now we do find that the claimant is " entitled to use all the water impounded by the new Minetto dam not required for the Barge Canal or purposes of navigation " and we, therefore, hold at this time that the waiver and release of April 14, 1910, is a valid instrument and binding upon the claimant herein and serves to release the State from all damages to this claimant as set forth in the claim herein.

We hold that the claimant has the right to use its water for power at the head made available at the present State dam at Minetto. But we do not at this time pass upon the question as to whether that is a right in perpetuity or what may be called a vested right.

We had this same question also before us in the *American Woolen Company* case (125 Misc. 186, 210, *supra*). What we said there is apropos here. I quote from that opinion what we then held on that subject as follows:

" In this connection the learned counsel for the claimant says he has inquired of the Attorney-General if he concedes that the claimant's right to the new head is a vested right.

" That question, of course, is not in this case and it is well enough perhaps to pass on that question, so far as it is controlled by the facts of this case when the State, if it ever does, disputes claimant's right to the use of the new head available at the Barge canal dam without making compensation. Or, at least, when the State claims the right to lower the crest of that dam without making compensation to the claimant or the then owner of the property in question."

We do not think that our refusal to pass upon this question at this time renders the claimant's waiver and release of April 14, 1910, ineffective. We think the Attorney-General had the correct view of this matter as expressed at page 188 of his brief on the preliminary issues herein as follows:

" The eighth paragraph relates to a subject matter separate and distinct from the remaining portions of the instrument. The remainder of the instrument is not made dependent upon the provisions contained in the eighth paragraph, nor, as we read the instrument, was it intended that they should be, and vice versa.

" The eighth paragraph is not based upon any consideration. It was not agreed to by any constituted authority, nor was it intended that it should be. It is not made a condition precedent to the other provisions becoming effective.

" To summarize — we believe that the waiver and release of April 14, 1910 (Ex 126) is a valid instrument; but that it contains no agreement on the part of the State except as set forth in the eighth paragraph, and that that paragraph is valid or invalid according to whether or not the Court finds that the Minetto-Meriden Company independent of its provisions, possessed a vested permanent right to the head created or rendered available by Dam No. 5; that aside from that paragraph it is a release of claims growing out of the taking or damaging of

its property in the course of the Barge Canal improvement, conditioned (1) that the State would not appropriate the right, title or interest, if any, of the Minetto-Meriden Company in the surplus waters of the river, and (2) that the State would construct, complete and maintain the Barge Canal improvement between Fulton and Oswego in accordance with the general plan of the Advisory Board, with both of which conditions the State has complied.''

For twenty years past the stipulations in said waiver and release have been fulfilled, acted upon, and lived up to by both the State and the claimant. It now may be looked upon as an agreement that has been fully executed by both parties. The question of whether the claimant has a vested right in the head created by the present State dam is a question that cannot be finally determined by either of the parties to that agreement. Such determination rests with the courts alone. It is a question that may never arise. The elevation of the crest of the present dam cannot be changed so long as the present plan of the canal is adhered to. There is nothing in the case that indicates that there is any prospect of a change ever being made in that plan. The question, therefore, as to whether the State must compensate the claimant for damages if it ever lowers that crest is at present academic and nothing more. It is a question which can only be determined properly when the situation arises and under all the circumstances existing at that time.

We hold, therefore, that the release and waiver of April 14, 1910, is valid and binding upon the claimant, and that by reason thereof the claim of the claimant herein must be dismissed.

We also hold that, inasmuch as there is not now any basis for the counterclaim as we have indicated above, that also must be dismissed.

Findings may be prepared in accordance with this opinion and filed with the court to be used by it in making the formal decision herein.

BARRETT, P. J., and RYAN, J., concur.